Filed 5/24/18

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| FACEBOOK, INC., et al., | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | S230051 |
| | ) | |
| THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO | ) ) | Ct.App. 1/5 A144315 |
| | ) | |
| Respondent; | ) | |
| | ) | San Francisco City and County |
| DERRICK D. HUNTER et al., | ) | Super. Ct. Nos. 13035657, |
| | ) | 13035658 |
| Real Parties in Interest. | ) | |
| | ) | |

### INTRODUCTION AND OVERVIEW

Real parties in interest Derrick Hunter and Lee Sullivan (defendants) were indicted by a grand jury and await trial on murder, weapons, and gang-related charges arising out of a drive-by shooting in San Francisco.  Each defendant served a subpoena duces tecum on one or more petitioners, social media service providers Facebook, Inc. (Facebook), Instagram, LLC (Instagram), and Twitter, Inc. (Twitter) (collectively, social media providers, or simply providers).  The subpoenas broadly seek public and private communications, including any deleted posts or messages, from the social media accounts of the homicide victim and a prosecution witness.

As explained below, the federal Stored Communications Act (18 U.S.C. § 2701 et seq., hereafter SCA or Act)[1] regulates the conduct of covered service providers, declaring that as a general matter they may not disclose stored electronic communications except under specified circumstances (including with the consent of the social media user who posted the communication) or as compelled by law enforcement entities employing procedures such as search warrants or prosecutorial subpoenas. Providers moved to quash defendants' subpoenas, asserting the Act bars providers from disclosing the communications sought by defendants. They focused on section 2702(a) of the Act, which states that specified providers "shall not knowingly divulge to any person or entity the contents of" any "communication" that is stored or maintained by that provider. They asserted that section 2702 prohibits disclosure by social media providers of *any* communication, whether it was configured to be public (that is, with regard to the communications before us, one as to which the social media user placed no restriction regarding who might access it) or private or restricted (that is, configured to be accessible to only authorized recipients). Moreover, they maintained, none of various exceptions to the prohibition on disclosure listed in section 2702(b) applies here. And in any event, providers argued, they would face substantial technical difficulties and burdens if forced to attempt to retrieve deleted communications and should not be required to do so.

Defendants implicitly accepted providers' reading of the Act and their conclusion that it bars providers from complying with the subpoenas. Nevertheless, defendants asserted that they need all of the requested communications (including any that may have been deleted) in order to properly prepare for trial and defend against the pending murder charges. They argued that the SCA violates their constitutional rights under the Fifth and Sixth Amendments to the United States Constitution to the extent it precludes compliance with the pretrial subpoenas in this case.

---

[1] Future undesignated statutory references are to title 18 of the United States Code.

The trial court, implicitly accepting the parties' understanding of the SCA, agreed with defendants' constitutional contentions, denied providers' motions to quash, and ordered them to produce the requested communications for the court's review in camera. Providers sought, and the Court of Appeal issued, a stay of the production order. After briefing and argument, the appellate court disagreed with the trial court's constitutional conclusion and issued a writ of mandate, directing the trial court to quash the subpoenas. We granted review.

Our initial examination of the Act, its history, and cases construing it, raised doubts that section 2702 of the Act draws no distinction between public and restricted communications, and that no statutory exception to the prohibition on disclosure could plausibly apply here. In particular, we questioned whether the exception set out in section 2702(b)(3), under which a provider may divulge a communication with the "lawful consent" of the originator, might reasonably be interpreted to permit a provider to disclose posted communications that had been configured by the user to be public.

Accordingly, we solicited supplemental briefing concerning the proper interpretation of section 2702. In that briefing, all parties now concede that communications configured by the social media user to be public fall within section 2702(b)(3)'s lawful consent exception to section 2702's prohibition, and, as a result, may be disclosed by a provider. As we will explain, this concession is well taken in light of the relevant statutory language and legislative history.

The parties differ, however, concerning the scope of the statutory lawful consent exception as applied in this setting. Defendants emphasize that even those social media communications configured by the user to be restricted to certain recipients can easily be shared widely by those recipients and become public. Accordingly, they argue that when any restricted communication is sent to a "large group" of friends or followers the communication should be *deemed* to be public and hence disclosable by the provider under the Act's lawful consent exception. On this point we reject defendants' broad view

3

and instead agree with providers that restricted communications sent to numerous recipients cannot be deemed to be public — and do not fall within the lawful consent exception. Yet we disagree with providers' assertion that the Act affords them "discretion" to defy an otherwise proper criminal subpoena seeking public communications.

In light of these determinations we conclude that the Court of Appeal was correct to the extent it found the subpoenas unenforceable under the Act with respect to communications addressed to specific persons, and other communications that were and have remained configured by the registered user to be restricted. But we conclude the court's determination was erroneous to the extent it held section 2702 also bars disclosure by providers of communications that were configured by the registered user to be public, and that remained so configured at the time the subpoenas were issued. As we construe section 2702(b)(3)'s lawful consent exception, a provider must disclose any such communication pursuant to a subpoena that is authorized under state law.

Ultimately, whether any given communication sought by the subpoenas in this case falls within the lawful consent exception of section 2702(b)(3), and must be disclosed by a provider pursuant to a subpoena, cannot be resolved on this record. Because the parties have not until recently focused on the need to consider the configuration of communications or accounts, along with related issues concerning the reconfiguration or deletion history of the communications at issue, the record before us is incomplete in these respects. Accordingly, resolution of whether any communication sought by the defense subpoenas falls within the statute's lawful consent exception must await development of an adequate record on remand.

We will direct the Court of Appeal to remand the matter to the trial court to permit the parties to appropriately further develop the record so that the trial court may reassess the propriety of the subpoenas under the Act in light of this court's legal conclusions.

4

## I. FACTS AND LOWER COURT PROCEEDINGS

### A. Grand Jury Proceedings and Indictment[2]

According to testimony before the grand jury, at midday on June 24, 2013, Jaquan Rice, Jr., was killed and his girlfriend, B.K., a minor, was seriously injured in a drive-by shooting at a bus stop in the Bayview district of San Francisco. Various surveillance videos showed a vehicle and someone firing a handgun from the rear window on the driver's side. A second person was depicted leaving the vehicle from the rear passenger-side door and firing a gun with a large attached magazine.

Witnesses identified defendant Derrick Hunter's 14-year-old brother, Quincy, as one of the shooters. During questioning in the early morning hours after the events, police homicide detectives told Quincy that they had "pulled all Instagram . . . [and] Facebook stuff," and were aware that he knew the shooting victim. Quincy related that the victim had "tagged" him on Instagram in a video featuring guns. The detectives responded that they had been "working all day" on the matter and had "seen those posts." Quincy admitted that he shot the victim six times — and asserted that the victim "would have done the same thing to us."[3]

Quincy stated that "Nina," his girlfriend's sister, had provided the car in which he, his brother, and one other male had driven. Within a few minutes of the shooting, police

---

[2]    This and the following sections are based on the grand jury transcripts, of which we have taken judicial notice, as well as material in providers' appendix of exhibits — including pretrial moving papers and the transcripts of two sessions of a pretrial hearing.

[3]    Ultimately Quincy was tried in juvenile court, found to be responsible for Rice's murder and the attempted murder of B.K., declared a ward of the court, and committed to the Department of Juvenile Justice for a term of 83 years four months to life. Under Welfare and Institutions Code section 607, subdivision (b), however, because of his age at the time of the crimes, he will not be confined beyond his 25th birthday. After the Court of Appeal affirmed in an unpublished opinion (A142771), we granted review (S238077) and held that matter pending disposition of the present litigation.

had stopped Nina, whose real name is Renesha Lee (hereafter sometimes Renesha), while driving the vehicle shown in the videos.

Renesha was codefendant Lee Sullivan's then girlfriend. She had rented the car used in the shooting and gave varying accounts of the events. According to her testimony before the grand jury, during the course of multiple interviews on the day and night of the killings, she initially "just made up names and stuff." Eventually she told the police that defendant Derrick Hunter and his younger brother Quincy were among those who had borrowed her car. Renesha did not mention defendant Sullivan's name until a few days later, when she "told them the truth about [Sullivan]," and that he had been involved along with the Hunter brothers.

Renesha related that on the day of the shooting she had driven with Sullivan and the Hunter brothers to a parking lot where they "got out and walked to Quincy['s] house." She explained that Sullivan told her the three young men were going to a store. Renesha recalled that she replied she would remain at the house and talk to her sister. She testified that Sullivan had not been wearing gloves when he and the others initially approached her to borrow the car, but she noticed that he was wearing gloves when they came out of Quincy's house and when they departed. According to Renesha, Sullivan drove away with the Hunter brothers in the backseat. She testified that when the three returned the car to her shortly thereafter it contained the phones of Sullivan and Derrick Hunter. She also testified that she had never seen Sullivan or either of the Hunter brothers with a gun.

Renesha explained that she had initially not revealed Sullivan's involvement because she had been scared and "just didn't want to have no parts of it because I'm the one that still has to live and walk these streets." She elaborated that once the police informed her that she might be arrested for murder, she "told them the truth," and yet still avoided implicating Sullivan until later in the process because she remained fearful of him. She maintained that after being threatened with prosecution she eventually told the full truth about Sullivan's role.

6

In presenting the case to the grand jury, the prosecution contended that defendants and Quincy were members of Big Block, a criminal street gang, and that Rice was killed for two reasons: (1) Rice was a member of West Mob, a rival gang, and (2) Rice had publicly threatened defendant Derrick Hunter's younger brother Quincy on social media. Inspector Leonard Broberg, a gang expert and member of the San Francisco Police Department Gang Task Force, testified that in his opinion the alleged crimes were committed for the benefit of the Big Block gang. He explained that "gangsters are now in the 21st century, and they've taken on a new aspect of being gangbangers, and they do something they call cyber banging. [¶] They will actually be gangsters on the internet. They will issue challenges; they will show signs of disrespect, whether it's via images or whether it's via the written word. . . . [¶] [They use] Facebook, . . . Instagram, Socialcam, Vine . . . [and] YouTube. . . . They will disrespect each other in cyberspace." Inspector Broberg described a YouTube video made by victim Rice and shared by him via his Facebook account, in which he gave a tour of his West Point/ Middle Point neighborhood and identified specific places where he could be located — including the bus stop where he was shot. Broberg characterized the video as a challenge to others. In a subsequent declaration, Broberg explained that he "rel[ies] heavily on records from social media providers such as Facebook, Instagram, and Twitter to investigate and prosecute alleged gang members for gang crimes," and that in the present case, he "relied in part on" such records to secure evidence that Rice, Sullivan, and the Hunter brothers "were members of rival gangs and that the shootings were gang related." The same declaration adds: "We [the police] have not sought search warrants as to Renesha Lee."[4]

---

[4] Toward the end of the proceedings, the prosecutor read to the grand jury some "exculpatory evidence . . . that was requested by the defense attorneys in this case be presented to you." The panel was told that two witnesses reported to police that a young woman had been driving the car, and that one witness had identified the driver as Renesha Lee. Yet another witness identified the driver as Quincy Hunter.

Defendants were indicted and are presently charged with the murder of Rice and the attempted murder of B.K. They also face various gang and firearm enhancements. (Pen. Code, §§ 187, 664, 186.22, subd. (b)(1), 12022, subd. (a), 12022.53, subds. (d) & (e)(1).)

## B. Description of the Subpoenas

Prior to trial, in late 2014, both defendants served subpoenas duces tecum (Pen. Code, § 1326, subd. (b)) on Twitter. Defendant Sullivan's subpoena sought "[a]ny and all public and private content" that had been "published by" Renesha Lee, who was identified by an attached photocopied screen shot of one of her Twitter accounts. The request specified no temporal boundary and stated that it "includes but is not limited to" (1) so-called record data, consisting of "user information [and] associated e-mail addresses," "activity logs," and "location data"; and (2) content information, such as "photographs, videos, private messages, . . . posts, status updates, . . . , and comments including information deleted by the account holder." It further sought the identity and contact information concerning the custodian of records who could authenticate the requested materials. Defendant Hunter's subpoena, issued a few weeks later, sought all "accounts" and tweets originating from Renesha Lee's "account and in response to or linking her account" from the beginning of 2013 "to the present." Neither defendant sought from Twitter any communication concerning victim Rice.

Only defendant Sullivan served subpoenas on Facebook and Instagram. The Facebook subpoena requested information regarding the accounts of both Rice and Renesha Lee. The language of the subpoena tracked Sullivan's request to Twitter, broadly seeking "[a]ny and all public and private content," including deleted material, that had been "published by" either Rice or Renesha Lee, each of whom was identified by an attached photocopied screen shot of that person's Facebook account. As with Sullivan's subpoena served on Twitter, the subpoena specified no temporal boundary and sought the same record data, content, and authentication information mentioned above.

8

Sullivan's subpoena served on Instagram similarly sought "[a]ny and all public and private content," including deleted material, published by Rice and Renesha Lee, each of whom was again identified by photocopied screen shots showing their account information.[5]  In all relevant respects the demands for record, content, and authentication information tracked the demands directed to the other social media providers.

## C.  Providers' Responses to the Subpoenas

Counsel for Facebook and its subsidiary Instagram responded to the Sullivan subpoenas by a single letter in December 2014, asserting that as providers governed by federal statute (the SCA), they are precluded under that law from divulging the requested stored communications.  The letter stated that under the SCA only the government may compel covered providers to divulge such stored content.  Accordingly, the letter recommended that defense counsel instead seek the requested information directly from the account holder or from "any party to the communication" — persons who, unlike a covered provider, are "not bound by the SCA."  Alternatively, the letter suggested that defense counsel might "work[] with the prosecutor to obtain" the requested information via an additional search warrant issued by the government.[6]  A few days later, different

---

[5]     It appears from the record that there may have been up to four relevant Instagram accounts, at least one for Renesha Lee and possibly three for Rice.  A photocopied screenshot attached as an exhibit to the subpoena pertaining to Renesha Lee indicated the account had four posts, one follower, and eight accounts that the account holder was following.  It also shows an image of a padlock, with a notation, "this user is private." According to subsequent pretrial briefing by defendants, "Mr. Rice had multiple social media accounts" and "many . . . have been deleted, including accounts gang expert Leonard Broberg relied upon at the grand jury hearing."  Moreover, according to that same subsequent briefing, defendants also asserted that "many of [Renesha Lee's social media] accounts have been deleted."

[6]     Finally, the letter explained that if defense counsel were to withdraw each subpoena "to the extent it seeks content," Facebook and Instagram might produce "non-content information" regarding the specified accounts, "such as basic subscriber information and [internet protocol] logs" — information that defense counsel might use to contact other parties to the communications, in order to attempt to obtain the

9

counsel in the same law firm responded similarly on behalf of Twitter to defendant Sullivan.

Eventually all three providers moved to quash the subpoenas. They reiterated the assertions in their letters that defendants might try to obtain the requested information directly from the social media user who posted the communication, or from any recipient[7] — or perhaps via an additional search warrant issued by the prosecution.[8] They also

information directly from them. ("Basic subscriber information" (more fully described *post*, fn. 23) and internet protocol logs are forms of record/non-content data that, as implied in the letter, might be employed to identify a recipient of a communication in order to attempt to obtain electronic communications directly from that person.)

[7]     In this regard, providers relied on decisions such as *O'Grady v. Superior Court* (2006) 139 Cal.App.4th 1423, 1447 (*O'Grady*) [even when the Act precludes disclosure by a provider, it "does not render the data wholly unavailable; it only means that the discovery must be directed to the owner of the data, not the [SCA-regulated service provider] bailee" who is barred from disclosure]. (See generally Fairfield & Luna, *Digital Innocence* (2014) 99 Cornell L.Rev. 981, 1058 [suggesting that a "defendant could locate the relevant originator or recipient by accessing non-content identifying information, such as an IP address, and then seek production [from that person] directly"].)

[8]     Of course defendants are independently entitled to general criminal discovery, including exculpatory evidence, from the prosecution under Penal Code section 1054.1. Moreover, under authority such as *Brady v. Maryland* (1963) 373 U.S. 83, *People v. Salazar* (2005) 35 Cal.4th 1031, 1042-1043 (and cases cited), and *Barnett v. Superior Court* (2010) 50 Cal.4th 890, 900-901, the prosecution is obligated to share with the defense *any* material exculpatory evidence in its possession — including that which is potentially exculpatory. (See also Rules of Prof. Conduct, Rule 5-110(D), amended Nov. 2, 2017 [requiring "timely disclosure to the defense of all evidence or information known to the prosecutor that the prosecutor knows or reasonably should know tends to negate the guilt of the accused, mitigate the offense, or mitigate the sentence"] and corresponding discussion [observing that "the disclosure obligations in paragraph (D) are not limited to evidence or information that is material as defined by *Brady v. Maryland* . . . and its progeny. For example, these obligations include, at a minimum, the duty to disclose impeachment evidence or information that a prosecutor knows or reasonably should know casts significant doubt on the accuracy or admissibility of witness testimony on which the prosecution intends to rely."].) As explained below, consistent with its discovery obligations under state and federal law, the prosecution has apparently shared

objected that the requests as drafted were overbroad and vague. In any event, providers asserted, disclosure *directly from them*, as entities covered by the SCA, was barred by that federal law. In that respect providers' motions relied upon section 2702(a), which broadly states that a covered "person or entity" such as providers "shall not knowingly *divulge to any person or entity the contents of a communication while in electronic storage by that service*." (Italics added.) Based on this language, providers asserted that the SCA's prohibition on a provider entity's ability to disclose any content information applies broadly and does not depend on whether the registered user configured a given communication as private/restricted as opposed to public. Moreover, providers asserted, none of section 2702(b)'s exceptions to the bar on disclosure by a provider applies here. Nor, they observed, does the Act contemplate procedures for criminal defendants to compel production of such communications.

### D. Defendants' Opposition to the Motions to Quash

Defendants opposed the motions to quash,[9] but they did not contest providers' assertion that section 2702(a) prohibits providers from disclosing any of the sought communications — even those configured by the registered user to be public. Nor did defendants challenge providers' assertion that none of section 2702(b)'s exceptions apply in this case. Instead, defendants argued that their federal constitutional rights under the Fifth and Sixth Amendments to a fair trial, to present a complete defense, and to cross-examine witnesses support their subpoenas and render the SCA unconstitutional to the

---

with defendants information relating to victim Rice's social media accounts. (See *post*, fn. 10.)

[9]      As the Court of Appeal observed below: "[T]he record before us [makes it unclear whether defendant] Hunter joined in the opposition to the motions to quash below, but he has formally joined in Sullivan's arguments in this court. For simplicity's sake, we refer to the opposition below as that of [d]efendants collectively." We adopt the same approach.

11

extent it purports to afford providers a basis to refuse to comply with their subpoenas. Defendants acknowledged that no court had ever so held, and asked the trial court to be the first in the nation to do so.

Defendants presented offers of proof concerning the information sought from the various accounts. The prosecution had secured from Facebook and Instagram some of the available social media communications attributed to Rice and, as obligated, had shared that information with defendants in the course of discovery.[10] Regarding the information concerning Rice's communications, defendants asserted that review of the full range of content from those various accounts is required in order to "locate exculpatory evidence" and to confront and cross-examine Inspector Broberg, in order to challenge his assertion that the shooting was gang related. In support defendants cited Broberg's grand jury testimony and attached examples of five Facebook screen shots reflecting videos alleged to have been posted by Rice. Counsel asserted that the subpoenaed records would show that Rice was "a violent criminal who routinely posted rap videos and other posts threatening Quincy Hunter and other individuals."

Although the prosecution had secured and shared *some* of Rice's Facebook communications and a portion of the Instagram posts attributed to him, the prosecution had not sought from providers the social media communications of their key witness, Renesha Lee. Nevertheless, it appears from the record that at least one of Renesha Lee's Twitter accounts was public and contained numerous tweets that were accessible to defense counsel. Counsel evidently accessed that account and identified content that,

---

[10]    (See *ante*, fn. 8.) Defendants subsequently asserted, however, that although they have had "access to some of Mr. Rice's social media records through the discovery process that tend to support the prosecution's theory of the case," still they lacked "access to records necessary to present a complete defense and to ensure the right to effective assistance of counsel." Thereafter, in their joint reply brief filed in this court, defendants characterized the prosecution as having declined to obtain all of Rice's various Instagram accounts.

they asserted, indicated a strong likelihood that other similar, yet undiscovered — and possibly deleted — communications might exist. Defendants alleged that the prosecution's case turns on Renesha Lee's credibility and that "she is the only witness who implicates Sullivan in the killing."[11] Moreover, defendants explained, they sought additional corroborating information, consistent with that found already in Renesha Lee's public tweets, to demonstrate that she was motivated by jealous rage over Sullivan's involvement with other women and that she had repeatedly threatened others with violence.

In support of these assertions defendants' opposition appended, as an exhibit, photocopied screen shots of what was represented as two of Renesha Lee's Twitter accounts. They quoted a September 2013 tweet showing a photograph of a hand holding a gun and making specific threats: "I got da. 30 wit dat extend clip….. BIIIITCH I WILL COME 2YA FRONT DOOR….." Various other tweets from both accounts suggested a similar theme. Defendants asserted their need for and intention to use these and any other similar tweets, posts, comments, or messages, including deleted content, made by Renesha Lee on Twitter, Facebook, or Instagram, in order to impeach her anticipated testimony at trial. Defense counsel stated that, despite diligent efforts, Renesha Lee could not be located to be served with a subpoena duces tecum.

### E.  The Hearing on the Motions to Quash

The first session of the bifurcated hearing on the motions to quash was held in early January 2015. The trial court began by explaining that, in light of the pleadings, it was inclined to find the sought material "critical" to the defense against the pending charges, and to conclude that "defendants have a [constitutional] right to . . . information

---

[11]     Quincy, in his earlier confession, acknowledged that his brother Derrick was with him in the car when the shooting occurred, but he did not mention Sullivan as being in the car with them. Instead, he asserted that a third person, named Johnson, had been with him and his older brother in the car.

13

that's authentic . . . [and] reliable." The court questioned providers' alternative proposal that the prosecution could or should issue additional search warrants to them (the service providers) on behalf of defendants: "First, I think the District Attorney's office is going to . . . say[], . . . our job is not to perform your investigation for you. And, besides, the Penal Code . . . authorizes search warrants to be obtained [only] under certain circumstances, and . . . not to find evidence that might support an affirmative defense or mitigate a mental state [or impeach a witness]." The court also expressed concern about defendants' ability to obtain any tweets or posts that may have been deleted by the account holder, and regarding how those communications might be authenticated sufficiently to be allowed into evidence. In that respect, the court questioned whether Renesha Lee would be willing to "take ownership" of tweets attributed to her and quoted above, "[s]ome [of which] could be subjecting her to criminal liability."

The trial court next addressed Twitter's assertion that any "deleted contents" would "not [be] reasonably available" and hence providers would "not . . . be able to produce deleted contents or authenticate deleted content." The court expressed skepticism concerning Twitter's assertion that it would be unable to produce deleted content, observing: "[W]hat I . . . know from my time in discovery [is] that when I delete e-mails, they are not all deleted. [¶] Now, I don't know . . . to what extent they are kept on some server or archive that could be retrieved through some sort of search function, or whether some forensic computer person has a way of reconstructing files or not. [¶] So . . . if you are going to say that you complied and . . . state under penalty of perjury [supported by a] showing . . . that you have done what you can do, that's a separate thing. But, I doubt very much I am going to change my position that this material is critical, it has to be produced, and you are the ones holding it." Accordingly, the court tentatively denied the motions to quash and ordered that the materials be provided to it for in camera review pursuant to Penal Code section 1326. At the same time, the trial court allowed additional briefing to be filed before it ruled finally on the matter.

14

In its subsequent brief Twitter reiterated its assertion that section 2702 of the SCA fails to "distinguish between 'private' and 'public' content for purposes of its restrictions on providers' disclosure" and it maintained that "service providers are prohibited from producing *any* content, regardless of status." Facebook and Instagram asserted in their own subsequent brief that section 2702 of the SCA bars the requested discovery and that the Act "contains no exception for criminal defense subpoenas." Consistent with their broad assertion that no exception applied under section 2702, they did not address whether any of the sought communications had been configured by the account holder to be public or private/restricted. Twitter, by contrast, directly confronted that issue in its own final supplemental responsive brief, noting that one of the accounts in question is public, and that "[a]s of this filing, anyone can visit the account and review its content, including messages, photos, and videos. In fact, defendant has already done this and included some public content from the account in . . . support of his Opposition [brief]."[12]

In response, defendants contested the assertions by Facebook and Instagram that defendants could gain access to the sought communications by other means.[13] They

[12]    Twitter also stated: "On Twitter, if an account is public, its Tweets are public — a user cannot make individual Tweets public or private on a post-by-post basis." Further, Twitter addressed the trial court's stated concerns regarding retrieval of deleted content. It asserted that even if the SCA permitted it to comply with the subpoenas' demands, still, any "content deleted by the user is not reasonably available to Twitter."

[13]    Regarding Rice, defendants noted that because Facebook allows the default to be changed — and posts to be configured as public or private on a post-by-post basis — not all friends might have "content that Mr. Rice decided to withhold from a particular user." As observed *ante*, footnote 10, defendants conceded that they had access to some of Rice's social media records through the discovery process. But, they insisted, they nevertheless lacked access necessary to present a complete defense. Regarding Renesha Lee's social media records, defendants did not contest Twitter's assertions that one of her Twitter accounts was public and remained open and accessible to all as of the time of the trial court briefing and hearings. Still, defendants asserted, "many of [her other] accounts" (apparently referring especially to the Facebook and Instagram accounts mentioned earlier) "have been deleted," and hence they had no access to them, and yet providers did possess those "inactive and active accounts."

15

argued that unless providers are ordered to comply with the subpoenas, they will be deprived of the information they need and also will be hampered in their effort to "persuade a jury that the records in question originated from Ms. Lee's social media accounts."

After considering the additional briefing, in late January 2015 the trial court confirmed its earlier conclusions, commenting that it would be "untenable" to deny the requested material to defendants. The court further explored with the parties the issues of deleted communications and burdens that compliance would impose on providers. In that regard counsel for providers asserted that deleted *tweets* "don't persist in backup for all eternity" and to the extent some remained in storage, "they are going to be very cumbersome and burdensome to obtain." The court responded that it had insufficient information with which to weigh the benefit of production versus burdens, and noted that it could easily impose a temporal restriction on the information sought in order to render the request more reasonable and less burdensome. The court then asked counsel to address recovery of deleted content concerning "your other clients" — Facebook and Instagram. But that discussion never occurred, producing an evidentiary lacuna as to those providers. Thereafter, neither the parties nor the court addressed whether any of the sought tweets had been configured as public, or whether, for any time period, the user had protected the account and made tweets sent during that time accessible to followers only. Nor did the court or parties address the privacy configurations of the remaining Facebook and Instagram communications sought by defendants.

## F. The Trial Court's Ruling on the Motions to Quash

The trial court finalized its tentative rulings, denying all three motions to quash and ordering that providers submit all of the sought materials for its in camera review by a deadline in late February 2015.[14] The court stated that it understood providers might

---

[14]  As the Court of Appeal observed, defendant Hunter apparently did not formally oppose Twitter's motion to quash his subpoena. Nevertheless, the trial court assumed

16

seek writ review challenging its oral production order, and recognized that the Court of Appeal might stay its production order.

After discussing the need for a preservation order (see *post*, fn. 47), the court vacated the trial date, which had been set for the next day. All parties agreed to reconvene in early March, after the trial court had an opportunity to conduct in camera review of the information that the providers had been ordered to produce, or alternatively at a later date pending resolution of the writ proceeding providers intended to file contesting the court's oral production order.

## G. The Writ of Mandate Proceeding

Providers jointly filed a petition for a writ of mandate in the Court of Appeal contending that the trial court abused its discretion in denying the motions to quash. They asked the appellate court to "preserve the status quo" by issuing an immediate stay of the trial court's production order and planned in camera review. That court stayed the trial court's production order and issued an order to show cause asking why the relief sought in the petition should not be granted.

After full briefing and oral argument, the Court of Appeal filed an opinion concluding that the SCA barred enforcement of defendants' pretrial subpoenas and rejecting defendants' arguments that the Act violated their rights under the Fifth and Sixth Amendments to the federal Constitution. Reviewing the relevant case law with respect to the constitutional claims, the appellate court concluded: "The consistent and clear teaching of both United States Supreme Court and California Supreme Court jurisprudence is that a criminal defendant's right to *pretrial* discovery is limited, and lacks any solid constitutional foundation." (Italics in original.) The appellate court stressed, however, that its conclusion was confined to "*this stage of the proceedings*" and

such a motion and denied it on the same basis that it denied the motions to quash defendant Sullivan's subpoenas.

limited to the "pretrial context in which the trial court's order was made." (Italics in original.) It observed that defendants would remain free to seek "at trial the production of the materials sought here." The appellate court commented that the trial judge who would eventually conduct the trial "would be far better equipped" than the appellate court itself "to balance [defendants'] need for effective cross-examination and the policies the SCA is intended to serve," and suggested that the SCA might eventually need to be declared unconstitutional to the extent it precludes enforcement of such a *trial* subpoena issued by the trial court itself, or by defendants, with production to the court. With respect to the pretrial context, however, the appellate court directed the trial court to vacate its order denying providers' motions to quash the pretrial subpoenas, and to grant the motions to quash.

## II. PROPER INTERPRETATION OF THE STORED COMMUNICATIONS ACT

Because the parties agreed in the trial court that the SCA precluded providers from complying with defendants' subpoenas and the court accepted that proposition, the trial court proceeded on the assumption that providers' refusal to comply with the subpoenas raised only constitutional questions. It then decided the matter by resolving those constitutional issues in defendants' favor. As explained above, the Court of Appeal likewise viewed the case as raising only constitutional issues, and its decision in providers' favor was grounded on the appellate court's conclusion that defendants' constitutional claims were not viable in the pretrial context.

In their initial briefing in this court, the parties again proceeded on the assumption that the litigation raised only constitutional issues, and they debated the merits of defendants' constitutional contentions. Defendants reiterated the view that their federal constitutional right to due process under the Fifth Amendment, and their confrontation, compulsory process, and effective assistance of counsel rights under the Sixth Amendment, require that the Act be declared unconstitutional to the extent it precludes

18

the enforcement of their subpoenas in this case. They candidly recognized that case authority supporting their position is sparse. Ultimately, they suggested that we should overrule or distinguish our own decisions (especially *People v. Hammon* (1997) 15 Cal.4th 1117 and its progeny) in order to declare the SCA unconstitutional as applied and uphold their pretrial subpoenas. Providers, by contrast, asserted that no decision of any court supplies authority supporting defendants' entitlement to pretrial enforcement of their subpoenas. They argued that, to the extent defendants might later *at trial* be able to establish a due process right to the information they seek in order to secure a fair trial, their remedy at trial would not lie in a judicial declaration that the SCA is unconstitutional as applied to them. Instead, providers asserted, the trial court should at that time put the prosecution to a choice: (1) use its authority under the Act to acquire the sought materials on behalf of defendants and share them with defendants at trial, or (2) suffer consequences in the form of an adverse evidentiary ruling at trial, including potentially pivotal instructions to the jury, or outright dismissal of the prosecution's case.

As mentioned, our initial review of the SCA and the relevant legislative history of the pertinent provisions, as well as prior judicial decisions addressing related issues, led us to question the validity of the statutory interpretation of the SCA on which the case was litigated below. Specifically, we questioned whether the relevant statute, section 2702(a), which appears to bar providers from disclosing electronic communications configured by the user to be private or restricted, *also* bars providers from disclosing communications that had been configured by the user to be public. Accordingly, we requested supplemental briefing directed to that issue, identifying the portions of the legislative history that appeared most relevant.

As explicated *post*, part III.A., in the ensuing supplemental briefing all parties concede that section 2702(b)(3)'s lawful consent exception permits providers to disclose public communications. In order to understand the relevant provisions of the SCA and why we also conclude that the statute should be so construed, it is appropriate to review

19

the Act's general history, the language of the relevant statutory provisions, the specific legislative history of those provisions, and prior relevant case law.

## A. The SCA — History and General Background

Congress enacted the Electronic Communications Privacy Act in 1986. (ECPA; Pub.L. No. 99-508, 100 Stat. 1860.) Title I of that law, amending the prior "Wiretap Act," addresses the interception of wire, oral, and electronic communications. (§§ 2510-2521.) Title II of the law, set out in chapter 121, is often referred to as the Stored Communications Act, or SCA. It addresses unauthorized access to, and voluntary and compelled disclosure of, such communications and related information. (§§ 2701-2712.)

Prior to the ECPA's enactment, the respective judiciary committees of the House of Representatives and the Senate prepared detailed reports concerning the legislation. Each explained that the main goal of the ECPA in general, and of the SCA in particular, was to update then existing law in light of dramatic technological changes so as to create a "fair balance between the privacy expectations of citizens and the legitimate needs of law enforcement." (H.R. Rep. No. 99-647, 2d Sess., p. 19 (hereafter House Report); see also Sen. Rep. No. 99-541, 2d Sess., p. 3 (hereafter Senate Report) [speaking of protecting both "privacy interests in personal proprietary information" and "the Government's legitimate law enforcement needs"].)[15] Each report also highlighted a related objective: to avoid discouraging the use and development of new technologies.[16]

[15] The House Report described privacy protection as "most important," and noted: "[I]f Congress does not act to protect the privacy of our citizens, we may see the gradual erosion of a precious right. Privacy cannot be left to depend solely on physical protection, or it will gradually erode as technology advances." (House Report, *supra*, at p. 19, fns. omitted.) The Senate Committee expounded on this theme, observing that "computers are used extensively today for the storage and processing of information," and yet because electronic files are "subject to control by a third party computer operator, the information may be subject to no constitutional privacy protection" absent new legislation. (Sen. Rep., *supra*, at p. 3; accord, House Rep., *supra,* at pp. 16-19.)

[16] In this latter regard, the House Report, noting the "legal uncertainty" that surrounded the government's legitimate access to such stored information, expressed

These three themes — (1) protecting the privacy expectations of citizens, (2) recognizing the legitimate needs of law enforcement, and (3) encouraging the use and development of new technologies (with privacy protection being the primary focus) — were also repeatedly emphasized by the bill authors in their debate remarks.[17]  As this history reveals, and as a leading commentator on the SCA has explained, Congress was concerned that "the significant privacy protections that apply to homes in the physical world may not apply to 'virtual homes' in cyberspace," and hence "tried to fill this possible gap with the SCA."  (Kerr, *A User's Guide to the Stored Communications Act, and a Legislator's Guide to Amending It* (2004) 72 Geo. Wash. L.J. 1208, 1210.)[18]

---

concern that such conditions may expose law enforcement officers to liability, endanger the admissibility of evidence, encourage some to improperly access communications, and at the same time, "unnecessarily discourage potential customers [from] using such systems."  (House Rep., *supra*, at p. 19.)  Similarly, the Senate Report cited the same potential problems, and added that legal uncertainty might not only discourage use of "innovative communications systems" but also "may discourage American businesses from developing new innovative forms of telecommunications and computer technology."  (Sen. Rep., *supra*, at p. 5.)

[17]     For example, Congressman Kastenmeier, the bill's primary author, stressed as a governing principle "that what is being protected is the sanctity and privacy of the communication."  (132 Cong. Rec. 14879 (1986), at p. 14886.)  Senator Leahy, the bill's sponsor in the upper house, repeatedly referred to the need to "update our law to provide a reasonable level of Federal privacy protection to these new forms of communications" in order to address inappropriate acquisition by "overzealous law enforcement agencies, industrial spies, and just plain snoops" of "personal or proprietary communications of others."  (132 Cong. Rec. 14599 (1986), at p. 14600.)  Cosponsor Senator Mathias described the legislation as "a bill that should enhance privacy protection, promote the development and proliferation of the new communications technologies, and respond to legitimate needs of law enforcement."  (*Id.*, at p. 14608.)

[18]     Congress's conception of the internet more than 30 years ago was, of course, substantially different from the internet that exists today.  "The World Wide Web had not been developed, and cloud computing services and online social networks would not exist for nearly a decade.  Internet users in 1986 could essentially do three things: (1) download and send e-mail; (2) post messages to online bulletin boards; and (3) upload and store information that they could access on other computers.  The definitions and prohibitions listed in the SCA align with these three functions as they existed in 1986.

## B. Key Provisions of the SCA

### 1. *Rules regarding unauthorized access to stored communications: Sections 2701 and 2511(2)(g)(i)*

Section 2701(a) provides that, subject to specified exceptions, "whoever . . . intentionally accesses without authorization a facility through which an electronic communication service is provided" or "intentionally exceeds an authorization to access that facility" and "thereby obtains" an "electronic communication while it is in electronic storage in such system" commits an offense punishable by a fine or imprisonment.  At the same time, a separate provision contained in another part of the ECPA, section 2511(2)(g)(i), articulates a substantial limitation on section 2701's access prohibition: "It shall not be unlawful under . . . chapter 121 [that is, the SCA] . . .  [¶] . . . to . . . access an electronic communication made through an electronic communication system that is configured so that such electronic communication is readily accessible to the general public."[19]

### 2. *Rules prohibiting disclosure by service providers and listing exceptions under which providers are permitted to disclose "communications" or "customer records":  Section 2702*

Section 2702 addresses disclosure by certain covered service providers — and by no other person or entity.  (*Wesley College v. Pitts* (D.Del. 1997) 974 F.Supp. 375, 389.) Subsection (a)(1) declares that, subject to specified exceptions, "a person or entity providing an electronic communication service[20] to the public *shall not knowingly*

---

Because Congress has not updated the statute, courts have struggled to apply the SCA in light of the explosive growth of the World Wide Web." (Ward, *Discovering Facebook: Social Network Subpoenas and the Stored Communications Act* (2011) 24 Harv.J.L. & Tech. 563, 566, fns. omitted (*Discovering Facebook*).)

[19]     Section 2707 authorizes a civil action to enforce these and the following provisions of the SCA.

[20]     An electronic communication service (ECS) is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications."  (§ 2510(15).)

*divulge to any person or entity the contents of a communication while in electronic storage by that service*." (Italics added.) Similarly, and again subject to the same exceptions, subsection (a)(2) declares that "a person or entity providing remote computing service[21] to the public *shall not knowingly divulge to any person or entity the contents of any communication which is carried or maintained on that service . . . .*" (Italics added.) Finally, subsection (a)(3) bars any service provider from knowingly divulging any non-content "record or other information pertaining to a subscriber or customer" to any governmental entity.

The next two subsections of section 2702 — (b) and (c) — list *exceptions to the general prohibition* on disclosure by a service provider set forth in subsection (a). Subsection (b) describes eight circumstances under which a provider "may divulge the contents of a communication." As relevant here, subparts (1)-(3) of subsection (b) permit disclosure: (1) "to an addressee or intended recipient of such communication or an agent of such addressee or intended recipient"; (2) pursuant to section 2703, which, as described below, permits a "governmental entity" to compel a covered provider to disclose stored communications by search warrant, subpoena or court order; and (3) "with the *lawful consent of the originator or an addressee or intended recipient* of such communication, or the subscriber in the case of [a] remote computing service" (italics added). As explained below, some of the communications sought under the subpoenas at issue here may fall within the lawful consent exception set forth in section 2702(b)(3).[22]

---

**21** The term "remote computing service" (RCS) is defined as "the provision to the public of computer storage or processing services by means of an electronic communications system." (§ 2711(2).)

**22** The five other exceptions listed in section 2702(b) include disclosure incidental to the provision of the intended service or protection of the rights or property of the service provider; matters related to child abuse; and disclosure to a law enforcement agency of inadvertently obtained information that appears to pertain to a crime.

Finally, subsection (c) of section 2702 describes six circumstances under which a covered provider may divulge *non-content information* — that is, any "record or other information pertaining to a subscriber or to a customer of such service (not including the contents of communications. . . )."[23] As relevant here, the last of these exceptions permits disclosure "to any person other than a governmental entity" (§ 2702(c)(6)) — which includes defendants in this case.[24]

### 3. *Rules governing compelled disclosure by a service provider to a governmental entity: Section 2703*

As alluded to above, section 2703 governs compelled disclosure by covered providers to a "governmental entity." It sets forth the rules under which law enforcement entities may compel ECS and RCS providers to disclose private as well as public communications made by users and stored by covered service providers.[25]

---

[23] Such "non-content" records consist of logs maintained on a network server, as well as "basic subscriber information," including the following: "(A) name; [¶] (B) address; [¶] (C) local and long distance telephone connection records, or records of session times and durations; [¶] (D) length of service (including start date) and types of service utilized; [¶] (E) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address; and [¶] (F) means and source of payment for such service (including any credit card or bank account number)." (§ 2703(c)(2).)

[24] The five preceding listed exceptions include disclosures of non-content information (1) authorized under compulsion by a "governmental entity" under section 2703; (2) with the lawful consent of the customer or subscriber; (3) as necessary and incidental to the provision of the intended service or protection of the rights or property of the service provider; (4) self-initiated to a law enforcement agency under emergency conditions; or (5) related to child abuse. (§ 2702(c).)

[25] (§ 2703(a) & (b).) As alluded to *ante*, footnote 23, subsection (c) addresses compelled disclosure to a governmental entity of certain non-content information. Other subsections articulate the requirements of any court order compelling disclosure (§ 2703(d)), specify that there can be no cause of action against a provider who discloses information pursuant to this chapter (§ 2703(e)), and impose on providers a requirement to preserve evidence on request of a governmental entity "pending the issuance of a court order or other process" (§ 2703(f)(1)).

## C. House and Senate Reports Concerning the Relevant Provisions

The 1986 congressional reports took special note of then-existing electronic bulletin boards — early analogues to the social media platforms at issue here. In the course of these discussions, the respective judiciary committees focused on the configuration of posts as being private or public and indicated an understanding that section 2701, governing unauthorized *access* to communications, was intended to cover and protect only private and not public posts. Significantly, the reports indicated the same understanding regarding section 2702's ban on provider *disclosure* of electronic communications, as reflected in that section's lawful consent exception to the ban.

The extensive House Report, issued first, repeatedly focused on the public/private theme. It did so initially in a passage addressing section 2511(2) of the ECPA, which as noted above states in subsection (g)(i) that it "shall not be unlawful" under either the omnibus ECPA or its SCA subset to "access an electronic communication made through an electronic communication system that is configured so that such electronic communication is readily accessible to the general public." The committee explained that under this provision, it would be "permissible to intercept electronic communications made through an electronic communication system that is *configured so that such electronic communication is readily accessible to the general public*" and that "[t]he *term 'configure' is intended to establish an objective standard of design configuration to begin determining whether a system receives privacy protection*." (House Rep., *supra*, at p. 41.) Later, when the report addressed the SCA's analogue to this access rule, it explained that section 2701 would not "hinder the development or use of 'electronic bulletin boards' or other comparable services. *The Committee believes that where communications are readily accessible to the general public, the sender has, for purposes of Section 2701(a), extended an 'authorization' to the public to access those communications*. A person may reasonably conclude that a communication is readily accessible to the general public if the . . . means of access [is] widely known, and if a

25

person does not, in the course of gaining access, encounter any warnings, encryptions, password requests, or other indicia of intended privacy. *To access a communication on such a system should not be a violation of the law*." (House Rep*., supra*, at p. 62, italics added.) On the other hand, the report noted, some electronic bulletin boards may provide, in addition to a public forum, private e-mail services — and it observed: "Section 2701 would apply differently to the different services. *Those . . . electronic communications which the service provider attempts to keep confidential would be protected, while the statute would impose no liability for access to features configured to be readily accessible to the general public*." (*Id*., at p. 63, italics added.) The subsequent Senate Report similarly focused on electronic bulletin boards and repeatedly echoed the same public/private distinction. (Sen. Rep., *supra*, at pp. 8-9, 35-36.)

The House Report next turned to the provision that we must construe here, section 2702, prohibiting *disclosure* by covered providers of communications contents. The committee revealed its understanding that the theme of distinguishing between public and private posts carried over from section 2701's access rule and applied as well to section 2702's bar on the divulging of communications by providers.

The report observed that although section 2702(a) articulates a general prohibition on disclosure by a provider, section 2702(b)(3), setting out one of eight exceptions to that rule, permits such a provider to divulge contents "with the lawful consent of the originator or any addressee or intended recipient" of the communication. (House Rep., *supra*, at p. 66.) The committee explained that, in its view, *implied* lawful consent by a user — and hence permissible disclosure by service providers — would readily be found with regard to communications configured by the user to be accessible to the public. It stressed that consent as contemplated by section 2702(b)(3) "need not take the form of a formal written document of consent." (*Ibid*.) The report viewed consent to disclosure as being implied by a user's act of posting publicly, and/or by a user's acceptance of a provider's terms of service: "Consent may . . . flow from a *user having had a reasonable*

26

*basis for knowing that disclosure or use may be made with respect to a communication, and having taken action that evidences acquiescence to such disclosure or use — e.g., continued use of such an electronic communication system.*" (*Ibid*., italics added.)  The report explained that "[a]nother type of *implied consent* might be inferred from *the very nature of the electronic transaction. For example, a subscriber who places a communication on a computer 'electronic bulletin board,' with a reasonable basis for knowing that such communications are freely made available to the public, should be considered to have given consent to the disclosure or use of the communication*." (*Ibid*., italics added.)  Moreover, the report continued, "*If conditions governing disclosure or use are spelled out in the rules of an electronic communication service, and those rules are available to users or in contracts for the provision of such services, it would be appropriate to imply consent on the part of a user to disclosures or uses consistent with those rules*." (*Ibid*., italics added.)  In other words, the committee indicated its understanding that with regard to electronic communications configured by the user to be accessible to the public, a covered service provider would be free to divulge those communications under section 2702(b)(3)'s lawful consent exception.  Nothing in the subsequent Senate Report took issue with this analysis. (Sen. Rep., *supra*, at pp. 36-38.)

### D.  Cases Construing the SCA in Light of the House and Senate Reports

Prior decisions have found that Facebook and Twitter qualify as either an ECS or RCS provider and hence are governed by section 2702 of the SCA.[26]  All parties assume the same with respect to all three providers before us.  We see no reason to question this threshold determination.

---

[26]  See, e.g., *Crispin v. Christian Audigier, Inc.* (C.D.Cal. 2010) 717 F.Supp.2d 965, 987-990 (*Crispin*) [regarding Facebook posts and private messages]; *Ehling v. Monmouth-Ocean Hosp. Service Corp.* (D.N.J. 2013) 961 F.Supp.2d 659, 665-670 (*Ehling*) [implicitly concluding the same regarding Facebook posts].)  A New York trial court has implicitly reached the same conclusion regarding Twitter tweets. (*People v. Harris* (N.Y.Crim.Ct. 2012) 949 N.Y.S.2d 590, 596.)

Only a few decisions have construed the relevant provisions of the SCA, and nearly all have concerned civil litigation.  Most have focused on claims that a party had obtained unauthorized *access* to stored communications under section 2701, and hence are not directly applicable here.  Two decisions have addressed the question we face in this criminal matter — whether section 2702 bars covered service providers from *divulging social media communications* in response to a subpoena.  For context — and because, as we will see, one of the key section 2702 disclosure cases subsequently relied on some of the section 2701 access cases — it is useful to briefly address the access cases before discussing the disclosure decisions.

        1. *"Unauthorized access" cases interpreting section 2701*

*Konop v. Hawaiian Airlines, Inc.* (9th Cir. 2002) 302 F.3d 868 (*Konop*) concerned asserted unauthorized access to communications on a restricted and password-protected electronic bulletin board.  The Ninth Circuit panel, citing some of the passages set out in the two judiciary committee reports noted above, concluded that this legislative history "suggests . . . Congress wanted to protect electronic communications that are configured to be private, such as email and private electronic bulletin boards" and that Congress intended the configuration of communications would " 'establish an objective standard [for] determining . . . privacy protection.' " (*Id*., at pp. 875 & 879, fn. 8, quoting House Rep., *supra*, at p. 41.)  Subsequently, *Snow v. Direct TV, Inc*. (11th Cir. 2006) 450 F.3d 1314, quoted and extended *Konop*'s observation.  The Eleventh Circuit concluded that in light of section 2511(2)(g)(i) and some of the legislative history described earlier, Congress intended to confine the reach of section 2701's access bar to those stored electronic communications that were configured to be restricted and not readily accessible to the general public.  (450 F.3d at pp. 1320-1321.)

More recently, in *Ehling, supra*, 961 F.Supp.2d 659, a federal district court addressed a party's asserted unauthorized access to a user's restricted Facebook posts.  The court highlighted the House Report's understanding that the configuration of

28

communications would determine whether any given post is "accessible to the public" (*id.*, at p. 666), and it relied on section 2511(2)(g)(i) (permitting *access* to communications that are "readily accessible to the general public") as well as *Konop* and *Snow* in concluding that "the SCA covers: (1) electronic communications, (2) that were transmitted via an electronic communication service, (3) that are in electronic storage, and (4) *that are not public.*" (*Ehling, supra,* at p. 667, italics added.) The court found that Facebook "posts . . . configured to be private meet all four criteria." (*Ibid.*) In reaching this conclusion the court observed that decisions "interpreting the SCA confirm that information is protectable *as long as the communicator actively restricts the public from accessing the information.*" (*Id.*, at p. 668, italics added.)

The *Ehling* court elaborated: "The touchstone of the Electronic Communications Privacy Act is that it protects private information. The language of the statute makes clear that the statute's purpose is to protect information that the communicator took steps to keep private." (*Ehling, supra,* 961 F.Supp.2d at p. 668.) It reasoned: "Facebook allows users to select privacy settings . . . . Access can be limited to the user's Facebook friends, to particular groups or individuals, or to just the user. *The Court finds that, when users make their Facebook . . . posts inaccessible to the general public,* [*those*] *posts are 'configured to be private' for purposes of the SCA. . . .* [W]hen it comes to privacy protection, the critical inquiry is whether Facebook users *took steps to limit access to the information* [in their posts]. Privacy protection provided by the SCA does not depend on the number of Facebook friends that a user has." (*Ibid.*, italics added.)[27]

---

[27] The court in *Ehling* observed that the plaintiff user had "approximately 300 Facebook friends" (961 F.Supp.2d at p. 662), and concluded that because she had configured her communications as limited to them, the posts were covered by section 2701. (*Ehling,* at p. 668.) Nonetheless, the court ultimately rejected the plaintiff's claim of unauthorized access, finding that because an authorized recipient/friend had voluntarily shared the plaintiff's restricted communications with others, section 2701's "authorized user" exception was applicable. (*Ehling,* at pp. 669-671.)

*2. "Prohibited disclosure" cases interpreting section 2702*

In addition to the civil decisions construing section 2701's *access* rules and recognizing a public/private distinction in that setting, a few civil cases have concerned section 2702's prohibition on disclosure, as applied to third party subpoenas designed to compel *providers* to *divulge* electronic communications by the providers' users.

*a.* O'Grady *and related cases regarding subpoenas to providers seeking e-mail communications*

The first group of decisions addresses requests for disclosure by e-mail providers of their users' e-mail communications. A leading example is *O'Grady, supra*, 139 Cal.App.4th 1423, in which a California appellate court held section 2702 prevented an e-mail service provider from complying with a subpoena issued on behalf of Apple Computer (Apple). Apple sought the e-mail communications of an online news magazine to discover the identities of those who leaked confidential information about an impending Apple product. In concluding that section 2702 prohibited disclosure by the provider of such private e-mails (*O'Grady,* at pp. 1440-1451), the court distinguished between public posts that were made available "to the world," and the "contents of private [e- mail] messages" at issue in that case. (*Id.,* at p. 1449, italics omitted.) The court noted that it would reach a different conclusion, and presumably find disclosure permissible, "if the discovery [could] be brought within one of the statutory exceptions — most obviously, a disclosure with the consent of a party to the communication" under the lawful consent exception of section 2702(b)(3). (*O'Grady,* at p. 1446; see also *id.*, at p. 1447.) Likewise, other courts have concluded that section 2702 bars e-mail service providers from divulging private e-mail communications in response to third party civil subpoenas when, as in *O'Grady*, no exception to the Act's prohibitions on disclosure is applicable. (See, e.g., *In re Subpoena Duces Tecum to AOL, LLC* (E.D.Va. 2008) 550 F.Supp.2d 606, 611 ["[a]greeing with the reasoning in *O'Grady*" and declining to enforce

30

a subpoena seeking production of private e-mail communications absent an applicable exception to the prohibition on disclosure].)

### b. Viacom *and* Crispin — *regarding subpoenas served on providers seeking social media communications*

Two additional section 2702 disclosure cases are more pertinent to our present inquiry because they concerned disclosure by service providers, not of private e-mail, but of *social media communications*. As explained below, these decisions reflect an understanding that Congress intended section 2702 to prohibit disclosure by providers of only private or restricted, but not public, social media communications.

The first opinion, *Viacom Int'l Inc. v. YouTube Inc.* (S.D.N.Y. 2008) 253 F.R.D. 256, addressed efforts by copyright owners to compel a social media provider, YouTube, to divulge stored information regarding videos that users had configured as private or restricted. (*Id.*, at p. 264.) The federal district court quoted the House Report's observation, noted *ante*, part II.C., that one who posts a communication with a reasonable basis for knowing that it will be available to the public should be considered to have implicitly consented to such disclosure under section 2702(b)(3). (253 F.R.D. at p. 265.) The court held, however, that YouTube was barred under section 2702(a) from disclosing "videos that [users] have designated as private and chosen to share only with specified recipients" — and that on the facts presented, section 2702(b)(3)'s lawful consent exception was inapplicable. (*Viacom*, at pp. 264-265.)

The second decision, *Crispin, supra,* 717 F.Supp.2d 965, also concerned disclosure by a social media service provider under section 2702 in response to a civil discovery subpoena. The plaintiff in *Crispin*, an artist, sued the defendants, clothing manufacturers, asserting they violated a license to use his art. The defendants in turn issued subpoenas to various service providers, including Facebook and social media provider MySpace. The subpoenas broadly sought all manner of communications, ranging from public to private, between the plaintiff and others. The plaintiff moved to

quash the subpoenas on various grounds, including that the providers were barred by section 2702 from making the disclosures. A magistrate concluded that the section did not apply, and declined to quash the subpoenas with respect to any of the communications.

On review, the district court, relying on the legislative history of the SCA and the decision in *Konop*, *supra*, 302 F.3d 868, discussed above, determined first that so-called "private messaging" communications, like the e-mails in *Konop*, were configured to be private and hence protected from disclosure by service providers under section 2702(a). (*Crispin, supra,* 717 F.Supp.2d at p. 987.) Turning to the other communications, Facebook posts and MySpace comments, the court analogized those communications to the technology that existed in 1986 — postings on a " 'computer bulletin board' " system. (*Id.*, at p. 980.) The court concluded that "a completely public [bulletin board system] does not merit protection under the SCA" — and that " '[o]*nly electronic bulletin boards which are not readily accessible to the public are protected under the Act*.' " (*Id.*, at p. 981, italics added.) In other words, the court determined that Facebook posts and MySpace comments configured by registered users to be public are not protected from disclosure under section 2702(a) of the Act. But, the court reasoned, those communications would not be subject to disclosure by a provider if the user, like users of older restricted-access electronic bulletin boards, had configured the post or comment to be accessible only by a restricted group. (*Crispin*, at p. 981.)

Accordingly, the court in *Crispin* determined that the dispositive question was whether the posts had been configured by the user as being "sufficiently restricted that they are not readily available to the general public." (*Crispin, supra*, 717 F.Supp.2d at p. 991.) Further, the court found that any restrictive privacy configuration employed by the user should be honored, and would bar disclosure by a service provider under

32

section 2702 of the SCA, even if the restricted group is comprised of *all* of a user's Facebook friends. (*Crispin*, at p. 990.)[28]

Applying these principles to the motion to quash the civil subpoenas before it, the *Crispin* court observed that the parties had provided an incomplete record regarding the nature of the various private message services and other posts and comments services offered by those social media entities. Accordingly, the court remanded the matter "so that [the magistrate] can direct the parties to develop a fuller evidentiary record regarding plaintiff's privacy settings and the extent of access allowed to his Facebook [posts] and MySpace comments." (*Crispin, supra*, 717 F.Supp.2d at p. 991.)

The gist of *Crispin*'s discussion and treatment was that communications configured by the user to be restricted in some manner fall within section 2702's prohibition on disclosure by providers and are not subject to a civil subpoena directed to those providers. On the other hand, the subpoenas would be enforceable to the extent they sought Facebook posts and MySpace comments that had been configured by the registered user to be publicly accessible.

In reaching these conclusions *Crispin* relied heavily on the SCA's *access* provisions and related case law — and it focused generally on section 2702's *disclosure* bar without also considering specifically the lawful consent exception set out in section 2702(b)(3). Accordingly, the decision can be read as concluding that if Congress intended to withhold liability under section 2701 concerning those who *access* public

---

[28]    The *Crispin* court reasoned:  "Although here a large number of [registered] users, i.e., all of plaintiff's Facebook friends, might access the storage and attendant retrieval/display mechanism, the number of users who can view the stored message has no legal significance. Indeed, basing a rule on the number of users who can access information would result in arbitrary line-drawing and likely in the anomalous result that businesses such as law firms, which may have thousands of employees who can access documents in storage, would be excluded from the statute." (*Crispin*, *supra*, 717 F.Supp.2d at p. 990.)

33

communications, Congress must also have intended not to protect those same public communications from *disclosure* by covered providers under section 2702. Under this view, which appears to have been endorsed by some commentators,[29] the Act simply would not cover or protect communications that have been configured to be public. We do not endorse this reading of the Act, however. Instead, we conclude that, by virtue of section 2702(a), the Act generally and initially prohibits the disclosure of *all* (even public) communications — but that section 2702(b)(3)'s subsequent lawful consent exception allows providers to disclose communications configured by the user to be public. Thus, although we agree with the result in *Crispin*, we conclude that the decision in that case should have been grounded on the lawful consent exception to the general prohibition.

As observed *ante*, part II.C., the House Judiciary Committee discussed the public/private distinction articulated under section 2511(2)(g)(i) of the ECPA, and revealed that it viewed that same distinction as carrying over and applying under the related *access* provision of the SCA, section 2701. The House Report then proceeded to describe the *disclosure* provision, section 2702, in a manner showing that it considered the same public/private distinction to apply in that context as well *via the lawful consent*

---

**29** See, e.g., *Discovering Facebook, supra,* 24 Harv.J.L. & Tech. at page 584 ["Under the SCA, information that is 'readily accessible to the general public' is not protected from disclosure"]; Hankins, *Compelling Disclosure of Facebook Content Under the Stored Communications Act* (2012) 17 Suffolk J. Trial & App. Adv. 296, 314, 319 ["case law has made clear that communications that are 'readily accessible' by the public are not protected by the SCA"; "where a user's privacy settings allow the general public to view such communications, it is clear that the SCA will not govern such 'readily accessible' communications"; and when comments can be "viewable by anyone with internet access" they "would not be protected by the SCA"]; see also Comment, *Balancing the Scales of Justice* (2011) 9 J. on Telecomm. & High Tech. L. 285, 296-297 [distinguishing Facebook's private "user-to-user messaging functions," which are similar to e-mail, and that "would be protected by the SCA," from posts and "publicly-viewable" content "that would not be covered under the SCA"].

*exception* contained in section 2702(b)(3). We conclude that the *Crispin* decision properly focused on the user's configuration of communications, and it also reached the correct result — even though it did not explicitly rely, as it should have, on the lawful consent exception and legislative history illuminating that exception.[30]

### E. Conclusion Regarding Section 2702(b)(3)'s Lawful Consent Exception

In light of the foregoing analysis, we conclude that communications configured by a social media user to be public fall within section 2702(b)(3)'s lawful consent exception, presumptively permitting disclosure by a provider.

---

[30]     We also briefly note a recent Tennessee intermediate appellate court decision, *State v. Johnson and Williams* (Tenn.Crim.App. 2017) 538 S.W.3d 32 (*Johnson*). That litigation, like the present case, arose pretrial in a criminal prosecution. A percipient witness told the police that various "social media communications" concerning the events had been sent and received by her, as well as the victim and other friends of the victim, and both defendants, before and after the alleged offenses occurred. (*Id*., at p. 38.) One of two defendants issued subpoenas to, among others, the relevant social media service providers, broadly seeking all such communications. The state — but not the providers — moved to quash the subpoenas. (*Id*., at pp. 44-48.) The trial court denied the state's motion as to the providers, finding that the state lacked standing to object on their behalf. (*Id.*, at pp. 47-49.) On review the appellate court agreed and then proceeded, in dictum, to address matters that might arise on remand.

The court described the evolution of the SCA, extensively quoted sections 2701, 2702 and 2703, and briefly discussed some of the cases cited above, including *Crispin*. (*Johnson, supra,* 539 S.W.3d at pp. 63-69.) The appellate court next focused solely on section 2703, which as noted earlier concerns a *governmental entity's* authority to compel disclosure from providers. (*Johnson*, at pp. 69-70.) The court observed that the underlying defendants did not qualify as governmental entities — and from there jumped to the broad conclusion that the defendants "could not obtain" pursuant to their subpoenas "*any* information directly from the social media providers under the terms of the SCA." (*Id*., at p. 70, italics added.) In proceeding as it did, the *Johnson* court's dictum failed to consider the legislative history outlined above, the scope of section 2702's disclosure bar, or the lawful consent exception to that bar. As a result, the court failed to consider whether any of the sought social media communications had been configured by the users to be public, and thus were disclosable by the providers pursuant to the defense subpoenas.

## III. APPLICATION TO THIS CASE

### A. Overview:  The Parties' General Agreement in Their Supplemental Briefs That Public Communications May Be Disclosed Under the Lawful Consent Exception; Limitation of Our Analysis to That Statutory Issue; and the Need for Remand to the Trial Court

As alluded to earlier, in supplemental briefs concerning section 2702 filed in response to questions posed by this court, both parties now agree that a social media communication configured by a registered user to be public falls within section 2702(b)(3)'s lawful consent exception.[31]  In reaching this conclusion, providers retreat from their assertions that no exception to the prohibition applies with respect to any of the sought communications.  Providers concede that, based on the legislative history described earlier, "[w]hen a user chooses to make a communication freely accessible to the public, he or she has necessarily consented to its disclosure."  Accordingly, providers acknowledge that "as applied to communications that are available to the public, [section 2702(b)(3)'s] lawful consent exception allows a provider to disclose communications to any member of the public."

---

[31]     In their supplemental brief, providers initially maintain that defendants' failure to challenge providers' proposed statutory interpretation in the lower courts precludes this court from addressing the propriety of that statutory interpretation at this juncture.  We reject this contention.  It is this court, not defendants, that has raised issues different from those argued below.  When this court discovers a possible statutory interpretation question that may obviate the need to address a constitutional claim and solicits supplemental briefing on that issue, the statutory interpretation question is properly before us for resolution.  (See Rules of Court, rule 8.516(b)(2) ["The court may decide an issue that is neither raised nor fairly included in the petition or answer if the case presents the issue and the court has given the parties reasonable notice and opportunity to brief and argue it"].)  Here we are guided by the familiar principle that we should address and resolve statutory issues prior to, and if possible, instead of, constitutional questions (see, e.g., *Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 230-231, and cases cited), and that "we do not reach constitutional questions unless absolutely required to do so to dispose the matter before us." (*People v. Williams* (1976) 16 Cal.3d 663, 667, and cases cited.)

Nevertheless, both parties urge us to address not only the scope of the lawful consent exception, but also the constitutional issues originally framed and briefed. As alluded to in footnote 31, and as explained below, we find it proper at this point to address only the statutory issues, and not the constitutional claims.

As observed earlier, in the lower court proceedings the parties did not focus on the public/private configuration distinction. The trial court made no determination whether any communication sought by defendants was configured to be public (that is, with regard to the communications before us, one as to which the social media user placed no restriction on who might access it) or, if initially configured as public, was subsequently reconfigured as restricted or deleted. Nor is it clear that the trial court made a sufficient effort to require the parties to explore and create a full record concerning defendants' need for disclosure *from providers* — rather than from others who may have access to the communications. Consequently, at this point it is not apparent that the court had sufficient information by which to assess defendants' need for disclosure from providers when it denied the motions to quash and allowed discovery on a novel constitutional theory. In any event, because the record is undeveloped, we do not know whether any sought communication falls into either the public or restricted category — or if any initially public post was thereafter reconfigured as restricted or deleted.

In light of our interpretation of the Act, it is possible that the trial court on remand might find that providers are obligated to comply with the subpoenas at least in part. Accordingly, although we cannot know how significant any sought communication might be in relation to the defense, it is possible that any resulting disclosure may be sufficient to satisfy defendants' interest in obtaining adequate pretrial access to additional electronic communications that are needed for their defense. For these reasons, we will not reach or resolve defendants' constitutional claims at this juncture. Instead, we conclude that a remand to the trial court is appropriate.

In order to provide guidance to the trial court on remand, we discuss two issues regarding the statutory question that have been raised by the parties in their supplemental briefs.

**B. Defendants' Contention That Implied Consent to Disclosure by a Provider Is Established When a Communication Is Configured by the User to Be Accessible to a "Large Group" of Friends or Followers**

The parties now generally agree that communications configured by a social media user to be public fall within section 2702(b)(3)'s lawful consent exception and presumptively may be disclosed by a provider. Beyond this point of agreement, the parties disagree starkly concerning the proper scope and interpretation of the implied consent exception.

Defendants advance an expansive interpretation of the exception. They argue that a user's implied consent to disclosure by providers under section 2702(b)(3) should be triggered not only by communications configured by the user to be public, but also by those configured by the user to be *restricted*, but nonetheless accessible to a "large group" of friends or followers. Defendants contend that, in practice, social media users "lose[] control over dissemination once the information is posted," and can have no reasonable expectation of privacy even with regard to such restricted communications in light of the fact that any authorized recipient can easily copy any communication and share it with others. (Cf. *Moreno v. Hanford Sentinel, Inc*. (2009) 172 Cal.App.4th 1125, 1229-1230 [social media user had no reasonable expectation that a communication configured as restricted would not be shared with others and hence could not maintain a tort action for public disclosure of private facts].) Defendants observe that the internet, attendant technology, and social media itself did not exist when Congress considered and enacted the SCA. (See *ante*, fn. 18.) Therefore, they assert, section 2702 of the Act, generally prohibiting providers from disclosing stored communications, "should be

38

deemed inapplicable" on the ground that "social media posts to large groups are essentially public posts in which the user has no reasonable expectation of privacy."

In support, defendants rely primarily on distinguishable decisions finding social media communications discoverable in civil litigation from a social media user, not, as here, from a social media provider. (E.g., *Fawcett v. Altieri* (N.Y.Sup.Ct. 2013) 960 N.Y.S.2d 593, 597 [private social media posts may be compelled from a user in civil discovery "just as material from a personal diary may be discoverable"].) They also rely on cases such as *U. S. v. Meregildo* (S.D.N.Y. 2012) 883 F.Supp.2d 523, 526 (*Meregildo*) [rejecting Fourth Amendment claim and holding that a criminal defendant who restricted Facebook communications to "friends" had no legitimate expectation that a friend would not share that information with the government].) But none of these cases involving the propriety of compelling disclosure by social media *users* concerned or construed section 2702's prohibition on disclosure by *providers*.

Defendants criticize decisions such as *Crispin, supra*, 717 F.Supp.2d 965, and *Ehling*, *supra*, 961 F.Supp.2d 659, for analogizing social media communications to what they characterize as "nearly obsolete" electronic bulletin boards. They insist that focusing on such allegedly outdated sites prevented those courts from understanding that sharing is the essence of modern social media. Indeed, defendants and amici curiae on their behalf argue that, in the context of social media communications, there generally is no such thing as true privacy. Accordingly, they assert, even those social media communications configured by a user to be available to only specific friends or followers and that exhibit a "veneer of privacy" should nevertheless be treated as public. Defendants argue that such communications should not be protected by section 2702(a) — or that, alternatively, they should be deemed to fall within the lawful consent exception of section 2702(b)(3).

Providers and amicus curiae Google, LLC (Google), by contrast, assert that a registered user who configures a communication to be viewed by any number of friends

or followers — but not by the public generally — evinces an intent *not* to consent to disclosure by a provider under 2702(b)(3), but instead to preserve some degree of privacy. They too rely on *Meregildo, supra,* 883 F.Supp.2d 523, 525, which observed that Facebook "postings using more secure privacy settings reflect the user's intent to preserve information as private." They also rely on *Ehling, supra*, 961 F.Supp.2d at page 668, which, as noted earlier, focused on whether a Facebook user "actively restrict[ed] the public from accessing information" and found that when a user configures a communication to be available on only a limited basis and "inaccessible to the general public," such a post is " 'configured to be private' for purposes of the SCA." Under this authority, providers assert, a service provider remains prohibited from disclosing such communications. For reasons that follow, we agree with providers and Google on this point.

To begin with, we reject defendants' unsupported and rather startling assertion that social media communications and related technology fall categorically outside section 2702(a)'s general prohibition against disclosure by providers to "any person or entity."[32]

---

[32]    For similar reasons we reject a somewhat related alternative interpretation of that quoted phrase advanced by amici curiae on behalf of defendants, the California Public Defenders' Association and the Public Defender of Ventura County. Asserting that the phrase "any person or entity" in section 2702(a) should be interpreted to exclude a court, amici curiae propose to interpret that phrase to permit providers to disclose any and all stored communications (no matter how configured) to a trial court for its in camera review — and then, presumably, for the trial court to release at least some of those private communications to defendants.

In support of their argument that a trial court does not qualify as a person or entity under the statute, amici curiae simply cite *Marbury v. Madison* (1803) 5 U.S. 137. They argue that Congress must be presumed to have been aware of "existing law" (including Penal Code section 1326's in camera review procedures) as well as the Fifth and Sixth Amendment rights of defendants — and hence, they postulate, Congress must have contemplated that such an exception for in camera and ex parte review by a trial court would be "read into the Act" by the courts, "when and if," as here, "the need arises." Amici curiae add that "Congress . . . knows that the courts are the forum where controversies such as the one here will be resolved and that the courts will determine their own procedures" — including amici curiae's contemplated compelled compliance

40

Nor can we accept defendants' interpretation of section 2702(b)(3)'s lawful consent exception, which would sweep far more broadly than was envisioned by Congress. The legislative history suggests that Congress intended to exclude from the scope of the lawful consent exception communications configured by the user to be accessible to only specified recipients. There is no indication in the legislative history of any intent to do otherwise in the case of communications sent by a user to a large number of recipients who, even in 1986 when the Act was adopted, could have shared such communications with others who were not intended by the original poster to be recipients.

In this respect, providers argue, defendants' view "would effectively eliminate expectations of privacy in *all* communications" and hence "would undermine the privacy rights of all users, including those of criminal suspects and defendants. If the SCA excluded electronic communications that are made to ['large'] groups of people, then it would necessarily place no restriction on private party or *law enforcement* access to such communications. And if people had no reasonable expectation of privacy in communications sent through and maintained by the intermediary, simply because those communications could be later shared by their recipients, that would remove all Fourth Amendment protections for communications as well." (Italics in original.) Providers assert there is no indication that Congress contemplated such a result.[33]

_____

with in camera review by the trial court. Finally, amici assert that to the extent the Act "is interpreted to prohibit [in camera] judicial assessment of the exculpatory significance of the subpoenaed records," the SCA, as applied in this case, violates defendants' Fifth and Sixth Amendment rights, and hence is unconstitutional. Putting aside the constitutional claim, neither the statutory language nor its legislative history supports amici curiae's claim that the statute can reasonably be interpreted to permit disclosure of all electronic communications, private or public, to a court under all circumstances.

[33]     Moreover, as amicus curiae Google notes, if defendants' "premise were correct, a communication shared with only one person would be equally public because a single recipient could share a private communication with the world (and some recipients do). . . . The ability to share an electronic communication accordingly cannot be the basis

As observed *ante*, part II.C., the House Judiciary Committee suggested, in its discussion of *access* rules, an understanding that a user's configuration would "establish an objective standard" to determine privacy protection. When subsequently addressing the *disclosure* rules — and the lawful consent exception to those rules — the House committee stressed that a user's consent to disclosure could be implied in view of, among other things, providers' available published policies. (House Rep., *supra*, at p. 66.) Providers' posted policies and answers to frequently asked questions (FAQs), described below, are readily available, and they appear to shed light on the issues presented in this litigation. Although we will highlight and quote some of these available policies and FAQs, we emphasize that in doing so we do not preclude any party from advancing any additional point or argument — including the legal significance that should or should not be accorded such policies and FAQs.

The policies and FAQs warn registered users that a communication configured as public will generally become, in the words of the House Report, *supra*, at page 62, "readily accessible to the general public," and available to *any* person via the internet, whether that person is registered with the social media provider, or not.[34] This

---

for removing privacy protections from content posted with less-than-public privacy settings."

[34]     See, e.g., Twitter Privacy Policy, *Information Collection and Use/Tweets, Following, Lists, Profile, and other Public Information* <http://twitter.com/privacy> [as of May 22, 2018] [the service "broadly and instantly disseminates your public information to a wide range of users, customers, and services, including search engines"]; Facebook Help Center, *Appearing in Search Engine Results* <https://www.facebook.com/help/392235220834308> [as of May 22, 2018]; Facebook Help Center, *What is Public Information?* <https://www.facebook.com/help/203805466323736?helpref=faq_content> [as of May 22, 2018]; Instagram Help Center, *Controlling Your Visibility* <https://help.instagram.com/116024195217477> [as of May 22, 2018]. All internet citations in this opinion are archived by year, docket number and case name at <http://www.courts.ca.gov/38324.htm>.

42

widespread availability of public posts on the internet is the result of providers' business model, which allows and facilitates crawling and indexing by search engines (and in some instances, use of a so-called firehose stream) that generate search results lists displaying a link to the user's current social media page, a title and a snippet of text.[35] In other words, when, for example, a Facebook user configures a post as public, that communication becomes both (a) available to all two billion registered Facebook users, and (b) again in the words of the House Report, "readily accessible to the general public" via crawling by search engines. The result is that, as counsel for providers conceded at oral argument, a public communication is available to "everyone in the world" — even to those who are not registered Facebook users, but who have open access to the internet.

Providers' FAQs warn that even communications configured as restricted still might be shared by an authorized recipient with anyone else.[36] At the same time, nothing

---

[35] See, e.g., Google Search, *How Search organizes information* <https://www.google.com/insidesearch/howsearchworks/crawling-indexing.html> [as of May 22, 2018]; Google Search Console Help, *Create Good Titles and Snippets in Search Results* <https://support.google.com/webmasters/answer/35624?hl=en> [as of May 22, 2018]. Regarding Twitter's firehose stream, see, e.g., Financial Times Lexicon, *Definition of Twitter fire hose* <http://lexicon.ft.com/Term?term=Twitter-fire-hose> [as of May 22, 2018].

In addition, the three largest search engines — Google, Bing, and Yahoo! — also display in their results a link to a cached version of the social media user's page. (See, e.g., Google, *Search Help/View webpages cached in Google Search Results/How to get a cached link* <https://support.google.com/websearch/answer/1687222?hl=en> [as of May 22, 2018].) Google explains that "[c]ached links show you what a webpage looked like the last time Google visited it" and that "Google takes a snapshot of each webpage as a backup in case the current page isn't available. . . . If you click on a link that says 'Cached,' you'll see the version of the site that Google stored. (*Ibid*.)

[36] Even with regard to communications that a user configures — either initially when sent, or subsequently as reconfigured — to be available to only a defined group (such as followers or friends), any such restriction operates only within the confines of the service and the licensing agreements under which other entities interact with the provider. Providers are generally careful to avoid describing the effect of privacy configuration more broadly. (See, e.g., Facebook Help Center, *When someone re-shares something I posted, who can see it?* <https://www.facebook.com/help/569567333138410> [as of

43

of which we are aware in any of providers' policies or answers to FAQs suggests that users would have any reason to expect that, having configured a communication to be available not to the public but instead to a restricted group of friends or followers, the user nevertheless has made a *public* communication — and hence has impliedly consented to disclosure by a service provider, just as if the configuration had been public.

May 22, 2018] ["When someone clicks Share below your post, they aren't able to share your photos, videos or status updates *through Facebook* with *people who weren't in the audience you originally selected to share with*" (italics added, boldface omitted).])

Accordingly, when a user configures a post to be available to only specifically listed persons, the provider will be able to honor that user's choice only *within the service* — by disabling those recipients from, in turn, sharing that communication with others within the system through the system's sharing tools. Moreover, all three providers warn users that such configuration protection within each system does not prevent any authorized recipient from employing mechanisms outside the system to copy any post (by, for example, downloading or creating a screen shot) and then sharing the communication with anyone on the internet. (See, e.g., Twitter, *About public and protected Tweets/Who can see my Tweets?* <https://support.twitter.com/articles/14016> [as of May 22, 2018] ["Keep in mind that when you choose to share content on Twitter with others, this content may be downloaded or shared"].) Indeed, as Twitter advises, even when a user protects communications by restricting them to specific persons, that user's communications might nevertheless be shared by any such person with anyone else. (Twitter Help Center, *Twitter Privacy Policy/Information Collection and Use/Direct Messages and Non-Public Communications* < https://twitter.com/privacy?lang=en > [as of May 22, 2018] ["When you use features like Direct Messages to communicate privately, please remember that recipients may copy, store, and re-share the contents of your communications"]; see also Facebook, *Data Policy/How is this information shared?/Sharing our Services/People you share and communicate with* <https://www.facebook.com/policy.php> [as of May 22, 2018] ["people you share and communicate with may download or re-share this content with others on and off our Services"]; Instagram, *Privacy Policy/3. Sharing of your information/Parties with whom you may choose to share your User Content* <https://help.instagram.com/155833707900388> [as of May 22, 2018] ["Once you have shared User Content or made it public, that User Content may be re-shared by others. . . . [¶] If you remove information that you posted to the Service, copies may remain viewable in cached and archived pages of the Service, or if other Users or third parties using the Instagram API [Application Programming Interface] have copied or saved that information."].)

44

For all of these reasons we reject defendants' proposed broad interpretation of the lawful consent exception. We hold that implied consent to disclosure by a provider is not established merely because a communication was configured by the user to be accessible to a "large group" of friends or followers.[37]

## C. Providers' Argument That Section 2702 Affords a Provider Discretion to Decline to Comply with a Valid State Subpoena

Providers contend that to the extent section 2702(b)(3)'s lawful consent exception applies to any of the communications at issue here, that provision simply *authorizes* them to comply with the subpoenas, but does not by itself *compel* them to comply with the subpoenas. They further assert that section 2702(b) affords providers who are authorized to disclose, the "discretion" to refuse to do so — even in the face of an otherwise proper subpoena lawfully issued under state law. We agree with the first proposition, but not with the second.

---

[37] At the same time, we do not endorse the view, expressed by counsel for providers at oral argument, that if it were *possible* for a registered Facebook user to restrict a communication to "only" all of the other *two billion* Facebook users, such a communication would not qualify as public under the Act. To our knowledge, no case has endorsed that view and on its face the claim seems rather questionable, particularly inasmuch as Facebook does not generally limit who may join its social media platform. In this regard, we note that what is public under the SCA is not defined by what a social media provider labels as "public."

Nor are we aware of any prior case involving a user who has placed minimal restrictions on a communication within a large social media service (as another hypothetical example, a user who might disseminate a communication to all two billion Facebook users except for one or two people). Although we hold that limiting a communication to a "large group" does not render a post public, and acknowledge that on remand the trial court might find that the public configurations at issue in this case render the resulting communications public under the SCA, we also observe that neither the hypothetical discussed at oral argument nor this additional hypothetical involving minimal restrictions is presented in this case. Therefore, we need not and do not resolve whether such communications would be sufficiently public to imply consent to disclosure under section 2702(b)(3).

45

As observed earlier, section 2702(a) sets out a general prohibition against disclosure of communications by a service provider; and section 2702(b) lists exceptions under which a provider "may" disclose such communications — including, in subsection (3), communications regarding which a user has lawfully consented to disclosure. As the parties have conceded, such consent is applicable when a user posts a communication configured to be public. Plainly, section 2702(b) merely permits a provider to disclose, and it does not by itself impose a duty or obligation to disclose. Yet providers maintain that by use of the word "may," the section also operates to "ensure that providers would retain the discretion to choose whether to disclose content based on a user's consent" — even in the face of a lawful subpoena. In support, they rely on language in an order by a federal magistrate judge, *In re Facebook, Inc.* (N.D. Cal. 2012) 923 F.Supp.2d 1204, 1206, stating that although "consent may *permit* production by a provider, it may not *require* such a production." (Italics in original, boldface omitted.) Providers also rely on that order's footnote 7, which cited *United States v. Rodgers* (1983) 461 U.S. 677, 706 for the general proposition that "[t]he word 'may,' when used in a statute, usually implies some degree of discretion."

As explained below, a California Court of Appeal decision, *Negro v. Superior Court* (2014) 230 Cal.App.4th 879 (*Negro*), has thoroughly considered and rejected providers' argument. In that litigation, the plaintiff sued multiple defendants concerning business transactions. Prior to trial, the plaintiff subpoenaed defendant Negro's e-mail service provider, Google, seeking e-mail communications between him, his codefendants, and others. Defendant Negro eventually expressly consented to disclosure by Google of e-mails between himself and specific persons and entities covering a defined range of dates. But despite its user's express consent, Google refused to comply with the civil subpoena. On review, the Court of Appeal considered and applied section 2702(b)(3)'s lawful consent exception, ultimately finding that the defendant had given his express and enforceable written consent to service provider Google's disclosure of his e-mails.

46

(*Negro,* at pp. 893-899.) Having found the lawful consent exception satisfied, the appellate court further concluded that the subpoena was itself enforceable and that Google was required to comply with it. In the process, the court carefully considered and rejected the contention that providers raise now — that the statute empowers providers to defy subpoenas seeking communications that are exempted from section 2702's prohibition on disclosure under the section's lawful consent exception. (*Id.*, at pp. 899-904.) Because we find the *Negro* court's reasoning persuasive, we quote that decision's analysis at some length.

As an initial matter, the court in *Negro, supra,* 230 Cal.App.4th 879, rejected the claim that the SCA confers "a blanket exemption or immunity on service providers against compulsory civil discovery process." (*Id.*, at p. 899.) The court acknowledged that the SCA does not, on its face, contain any exception for or mention of civil (or for that matter criminal) discovery subpoenas. But the court explained that the Act's failure to expressly include such subpoenas does not "suggest that it rendered" the normal state law "discovery process impotent in all circumstances." (*Ibid.*)[38]

Turning to the same argument reprised by providers here, the court in *Negro* addressed Google's assertion "that the language of the Act makes the consent exception 'permissive' and the provider's disclosure under it 'voluntary' . . . so that 'Google may not be compelled by an order issued in a civil proceeding to disclose content, even with

---

[38]    The court continued: "Nor do we . . . perceive anything in the language of the Act suggesting that Congress intended to grant service providers a blanket immunity from obligations imposed by discovery laws. The Act does not declare civil subpoenas unenforceable; *it does not mention them at all*. As we have said, it *preempts* state discovery laws insofar as they would otherwise compel a service provider to *violate the Act.* It is this preemption that excuses service providers from complying with process seeking disclosures forbidden by the Act. But nothing in the Act suggests that service providers remain shielded from state discovery laws when the disclosures sought are *not* forbidden by the Act." (*Negro, supra,* 230 Cal.App.4th at p. 900, fn. omitted, first italics added, subsequent in original.)

47

the user's consent.' " (*Negro, supra,* 230 Cal.App.4th at p. 900.) The appellate court observed that Google relied on section 2702(b)'s "use of the word 'may' to frame the exception for disclosure based on a user's consent," and on the passage quoted above from the federal magistrate's order in *In re Facebook, Inc., supra,* 923 F.Supp.2d at page 1206. (*Negro,* at p. 900.) The court determined that the magistrate's reasoning "places much more weight on a very small word than it is designed to bear. It is certainly true that 'may' generally conveys permission, and that when used in contradistinction to 'shall' it implies a discretionary power or privilege, as distinguished from a mandatory duty. [Citations.]" (*Id.,* at p. 901.) But, the court reasoned, "The subdivision where 'may' appears is framed not as a grant of discretionary power *or* as the imposition of a mandatory duty but as a special *exception* to a general *prohibition.* In such a context all 'may' means is that the actor is excused from the duty, liability, or disability otherwise imposed by the prohibition. Stating that the actor 'may' engage in the otherwise proscribed conduct is a natural way — indeed the most natural way — to express such an exception." (*Id.,* at p. 902, italics in original.)

The appellate court in *Negro* continued: "Another federal magistrate judge has observed that 'there should be a clear expression of congressional intent before relevant information essential to the fair resolution of a lawsuit will be deemed absolutely and categorically exempt from discovery and not subject to the powers of the court under [rules governing disclosure].' [Citation.] Congress's use of the word 'may' to frame an exception to the Act's general prohibition on disclosure is not such a 'clear expression of . . . intent' as will justify a reading of the Act that categorically immunizes service providers against compulsory civil process where the disclosure sought is excepted on other grounds from the protections afforded by the Act." (*Negro, supra,* 230 Cal.App.4th at p. 902.)

Finally, the appellate court concluded: "In sum, we find no sound basis for the proposition that the Act empowers service providers to defy civil subpoenas seeking

discovery of materials that are excepted from the Act's prohibitions on disclosure. Insofar as the Act permits a given disclosure, it permits a court to compel that disclosure under state law." (*Negro, supra,* 230 Cal.App.4th at p. 904.) Accordingly, the court held that in light of the fact that the user/defendant had consented to disclosure by the service provider, "the Act does not prevent enforcement of a subpoena seeking materials in conformity with the consent given." (*Ibid.*)

Providers do not directly address the logic or substance of the *Negro* court's analysis quoted above. Instead, they assert, first, that the appellate court's decision is distinguishable because the underlying lawful consent in that case was express, whereas the present case concerns implied consent. This attempt to avoid *Negro*'s analysis ignores the legislative history described *ante*, part II.C., disclosing that Congress specifically contemplated that *implied* lawful consent would satisfy the lawful consent exception. It also is in tension with providers' own concession that implied lawful consent is effective with regard to communications configured by a registered user to be public. (See *ante*, pt. III.A.)

Alternatively, providers suggest that the SCA should be interpreted to bar the enforcement of any state subpoena that directs service providers to divulge public communications *that the Act permits but does not require them to disclose.* They assert that *Negro*'s contrary analysis and conclusion must be wrong because "it would permit a state subpoena to compel disclosure of content where the SCA itself does not. Such an expansion would weaken the protections of the SCA and impermissibly broaden federal law. It would thereby conflict with the SCA's comprehensive scheme of regulating the circumstances under which the disclosure of content is permissible or required."

In this respect providers implicitly rely on the fact that section 2703 lists circumstances in which a provider is compelled to disclose to governmental entities — and yet, as the *Negro* court observed, the Act, although preempting state discovery laws that would compel a provider to violate the federal statute, "does not mention" civil (or

49

criminal) subpoenas issued by nongovernmental entities in that section or indeed at all. (*Negro, supra,* 230 Cal.App.4th at p. 900; see *ante*, fn. 38.)  Consistently with *Negro*'s analysis, we believe that if Congress intended to preclude a state from enforcing a nongovernmental entity's civil or criminal subpoena that is lawful under state law (and as to which the federal statute does not preclude disclosure), such a prohibition would have been made clear in the Act.  We find no intent by Congress to preempt state law in this setting.[39]

### D.  Additional Issues Raised in the Supplemental Briefs, Some of Which Should Be Explored and Resolved on Remand to the Trial Court

Having addressed the legal issues that can be decided on the present record, we turn to other matters raised in providers' briefs that cannot be resolved at this stage — and some of which must await exploration on remand.

#### 1. Providers' assertion that most of the communications at issue are private and hence the lawful consent exception will not assist defendants

As observed earlier, the subpoenas in this case broadly seek "any and all public and private content."  Providers in their supplemental briefs assert variously that "much" or "most" (or all except a "small subset") of the communications sought by the subpoenas were configured by the users to be private or restricted, not public, and hence the lawful consent exception generally will not assist defendants in this case.  Because the parties did not acknowledge the relevance and applicability of the lawful consent exception in the trial court, no reliable record was made concerning either registered user's configuration of the social media communications at issue here.[40]  Moreover, as noted

---

[39]     To the extent dictum in *Johnson, supra,* 538 S.W.3d 32, is inconsistent (see *ante*, fn. 30), we disagree with its approach and analysis.

[40]     At the time relevant in this case, it appears that each provider's default setting for registered users was public, meaning that unless the user configured communications to be private, they were public.  (Regarding Twitter, see *Twitter Privacy Policy/Information Collection and Use/Tweets, Following, Lists, Profile, and other Public Information*

50

earlier, it is not apparent that the trial court had sufficient information to fully assess

defendants' need for discovery when it denied providers' motions to quash and allowed

defendants discovery on a novel constitutional theory.

> 2. *Providers' assertion that lawful consent to disclosure is revoked by a user's reconfiguration of a communication from public to restricted or by a user's deletion of a public communication*

As noted, providers concede that they may, pursuant to the lawful consent

exception set forth in 2702(b)(3), disclose a post configured by the user to be public.

They maintain, however, that the fact a user may have *initially* configured a post for

public distribution should not necessarily resolve the question of the applicability of the

---

<http://twitter.com/privacy> [as of May 22, 2018]; regarding Facebook, see Electronic Frontier Foundation, *Facebook's Eroding Privacy Policy: A Timeline* (Apr. 28, 2010) <https://www.eff.org/deeplinks/2010/04/facebook-timeline> [as of May 22, 2018] [observing that in November 2009, Facebook reset user privacy default settings to public]; see also Facebook Newsroom, *Making it Easier to Share With Who You Want* (May 22, 2014) <http://newsroom.fb.com/news/2014/05/making-it-easier-to-share-with-who-you-want/> [as of May 22, 2018] [noting that in mid-2014 — well after most of the communications at issue in this litigation were sent — Facebook again changed its privacy policy default, reverting, for new users, from public to friends, and giving existing users new tools to help ensure that they post publicly only when they intend to do so]; regarding Instagram, see Instagram Help Center*, Controlling Your Visibility/Setting Your Photos and Videos to Private* <https://help.instagram.com/116024195217477> [as of May 22, 2018].)

From what we can glean from the record, it appears that Renesha Lee may not have changed the default on one of her Twitter accounts and made her tweets and/or any replies private. (See *ante*, pt. I.D. and related discussion.) The record does not address the configuration of Renesha Lee's Facebook communications. Finally, regarding Instagram, the record suggests that Renesha may have configured one Instagram account to be private. In addition, the record suggests that she may have had, and deleted, multiple additional accounts with some or all of the social media providers. The configurations of these additional accounts are unknown. (See *ante*, fn. 5.) Regarding victim Rice, the limited record suggests that he had accounts, perhaps multiple, and of unknown configuration, with Facebook and Instagram — and that some if not all of those accounts (including at least one relied upon by the prosecution's gang expert) have been closed. (*Ibid.*)

lawful consent exception.  Specifically, providers observe that a communication originally configured to be public subsequently can be reconfigured by the user to be restricted, can be deleted by the user, or the user can close the account.[41]  They argue that when such a change occurs before a provider is served with a subpoena, the reconfiguration or deletion should be understood as a revocation of lawful consent for purposes of section 2702(b)(3) — with the result that the provider would be prohibited by section 2702(a) from complying with a subpoena regarding any such communication.[42]

---

[41]    In this regard Facebook tells users:  "If you accidentally share a post with the wrong audience, you can always change it."  (Facebook, *Privacy Basics/Manage Your Privacy* <https://www.facebook.com/about/basics/manage-your-privacy/posts#6> [as of May 22, 2018]; see also Facebook Help Center, *How can I adjust my privacy settings?* <https://www.facebook.com/help/1936774506778703?helpref=related> [as of May 22, 2018] ["You can view and adjust your privacy settings at any time"].)  Twitter allows an account to be changed from unprotected to protected and vice versa, and states:  "If you at one time had public Tweets (before protecting your Tweets), those Tweets will no longer be public on Twitter, or appear in public Twitter search results [within the provider's system].  Instead, your Tweets will only be viewable and searchable on Twitter by you and your followers."  (Twitter Help Center, *About public and protected Tweets/What happens when I change my Tweets from public to protected?* <https://support.twitter.com/articles/14016#> [as of May 22, 2018].)  At the same time, Twitter explains, the opposite also occurs:  "If you later change your account settings to no longer protect your Tweets, Tweets that were previously protected will become public and may be indexed by third-party search engines."  (Twitter Help Center, *Why are my Tweets appearing on Google after deleting or protecting them?/Protected Tweets* <https://support.twitter.com/articles/15349#> [as of May 22, 2018].)  Finally, Instagram also allows an account to be changed from the default (public) to private, and vice versa. (Instagram Help Center, *Privacy Settings & Information/Privacy settings/How do I set my photos and videos to private so that only approved followers can see them?* <https://help.instagram.com/196883487377501/?helpref=hc_fnav> [as of May 22, 2018].)

[42]    Amicus curiae Google hypothesizes that any given communication originally configured as public, or any subsequent reverse reconfiguration of a communication from restricted to public, might conceivably be undertaken *not* by a registered user him- or herself, but by a person or entity who uses or hacks the user's account.  Any such action, Google argues, should be viewed as not constituting implied consent to disclosure by a provider.  We agree, and observe that the trial court on remand will be in a position to permit providers to attempt to establish, as a preliminary matter, that a given

52

Defendants, by contrast, insist that once a registered social media user configures a communication as public and posts it, triggering section 2702(b)(3)'s lawful consent exception and presumptively allowing disclosure by a provider, the user cannot subsequently revoke that implied consent to disclosure, even if the user promptly reconfigures any post as restricted or deletes the post or closes the account. In support, defendants assert that "any reasonable user knows once you make information publicly available on social media it will be '. . . broadly and instantly disseminate[d]' . . . 'to a wide range of users, customers, and services, including search engines, developers, and publishers . . .' just as Twitter advises in its terms of service."[43] Defendants assert that after a public communication has been made so widely available, "[r]evoking consent is as possible as un-ringing a bell."

The parties have cited no decision explicitly addressing whether reconfiguration, deletion or account closure operates to revoke consent for purposes of section 2702(b)(3), nor have we found any such case. It appears that providers' revocation claim poses a question of first impression.

Providers may be understood to invoke Congress's intent to protect users' privacy (as described *ante*, pt. II.A.), and to suggest that their proposed interpretation — under which a provider would be required to honor a user's reconfiguration or deletion so long as it was undertaken by the time a subpoena is issued — would afford greater protection to that privacy interest.[44] Defendants, on the other hand, question whether a social media

communication was configured, reconfigured, or deleted, by someone *other than* the registered account owner without authority of the owner.

[43]     See *ante*, footnote 34.

[44]     In support providers cite *Van Patten v. Vertical Fitness Group, LLC* (9th Cir. 2017) 847 F.3d 1037, 1047, which notes the "common law principle that consent is revocable." (Accord, *Neder v. United States* (1999) 527 U.S. 1, 21 [" ' "[W]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate

user's reconfiguration or deletion of a public post can in reality effectuate a revocation of consent to disclosure[45] — and whether Congress intended to ensure revocability of consent in this context. Because the record does not indicate whether, in fact, any public

the established meaning of these terms" ' "]; *Osorio v. State Farm Bank, F.S.B.* (11th Cir. 2014) 746 F.3d 1242, 1253 [quoting a dictionary for the proposition that " '[u]nder the common law understanding of consent, the basic premise of consent is that it is "given voluntarily," ' " and quoting the Rest.2d of Torts, § 892 for the proposition that " 'Consent is a willingness in fact for conduct to occur' " and that " ' "[C]onsent is terminated when the actor knows or has reason to know that the other is no longer willing for him to continue the particular conduct" ' "]; see also *State v. Brown* (Ore. 2010) 232 P.3d 962, 967 ["[A] person who places an item in plain view has relinquished any constitutionally protected privacy interest in the item. That person, however, may renew the privacy interest simply by removing the item from plain view."].)

[45]    In this regard, providers warn users, the acts of reconfiguration or deletion (or even account closure) do not reach outside the provider's system and prevent third parties that may have indexed and cached any communication from continuing to make a given communication available in its prior form to anyone on the internet. For example, Facebook notes that in that situation it has no "control over content that has already been indexed and cached in search engines" and it offers the same advice as do Instagram and Twitter to their own registered users: in order to "request the immediate removal of [a particular] search listing, you will have to contact the specific search engine's support team." (Facebook Help Center, *Appearing in Search Engine Results/I'm showing up in the results of other search engines even though I've chosen not to* <https://www.facebook.com/help/392235220834308/?helpref=hc_fnav> [as of May 22, 2018].) And yet even if a user identifies each search engine that displays the communication and seeks expedited recognition of any reconfiguration or deletion, the providers indicate that the most that can be said is that any given search engine will "eventually index updated . . . information" to reflect any reconfiguration protection or post deletion. (Twitter Help Center, *Why are my Tweets appearing on Google after deleting or protecting them?/How and when to send Google a request to remove information* <https://support.twitter.com/articles/15349#> [as of May 22, 2018].) Indeed, Instagram observes that there is no such thing as immediate reconfiguration or deletion of a public communication that has become available on a search engine; instead, "[i]t may take some time for these [other third party search engine] sites and Google to re-index and remove" a given communication "even if you delete your account." (Instagram Help Center, *Controlling Your Visibility/Instagram Privacy on the Web/How can I remove my images from Google search* <https://help.instagram.com/116024195217477> [as of May 22, 2018].)

communication sought by defendants was subsequently reconfigured or deleted before the relevant underlying subpoena was issued, we express no opinion on the revocation of consent issue — and leave it to be explored, if necessary, by the trial court on remand.

> 3. *Technical difficulties that providers may face in determining the applicable privacy configuration and retrieving deleted communications — and protecting providers from excessive burdens*

Providers assert that in light of a registered user's ability to reconfigure communications, "providers may not easily be able to determine the intended audience of a communication at any given point in time" and "it may be difficult for a provider to accurately identify" whether a given communication when posted was public or restricted. Likewise, speaking on providers' behalf, amicus curiae Google avers: "Providers do not routinely maintain records of past privacy settings for each post or message. Lacking such records, it would be *impossible* to determine the privacy configuration that applied when a communication was posted or sent." (Italics added.) Providers also assert that "if a user changes the privacy setting for a communication, a service may not be able to accurately determine prior privacy settings." In addition, providers assert it would be difficult for them to retrieve deleted communications. As noted by the trial court, however, a subpoena recipient has a general obligation to undertake reasonable efforts to locate responsive materials. Again, any technical difficulties a given provider may face in determining the relevant history of a particular communication, or retrieving any deleted communication, are matters to be explored at the anticipated hearing on remand.

Providers similarly urge that they should be protected from excessive burdens. As observed *ante*, part II.A., Congress articulated its main purposes in enacting the SCA: affording privacy protections to users while accommodating the legitimate needs of law

enforcement. It also articulated a tertiary goal: to avoid discouraging the use and development of new technologies. Providers' briefs characterize this additional purpose as one of "enhanc[ing] the use of communications services and protect[ing] providers from being embroiled as a nonparty in litigation." Amicus curiae on providers' behalf, Google, characterizes this additional purpose even more specifically as "protecting providers from an otherwise limitless burden of responding to requests to disclose their users' communications." Providers rely on dictum in *O'Grady, supra*, 139 Cal.App.4th 1423, in which the court voiced concern about the prospect of such subpoenas to providers in routine civil cases. (*Id.*, at pp. 1445-1447.)[46]

In light of the statutory scheme, it appears that Congress sought to limit burdens placed on service providers by various means — most obviously, by establishing broad prohibitions and specific exceptions regarding access and disclosure under sections 2701and 2702, along with rules and procedures pursuant to which the government may compel disclosure under section 2703. With regard to burdens related to disclosure in particular, Congress significantly limited the potential onus on providers by establishing a scheme under which a provider is effectively prohibited from complying with a subpoena issued by a nongovernmental entity — *except* in specified circumstances. But when any one of the exceptions does apply, there is no indication that Congress intended that providers would be categorically relieved from the burden of compliance with an

---

[46] In a related vein, providers observe that they stand in jeopardy of incurring civil liability under section 2707 of the Act if they knowingly or intentionally violate the SCA. But that section by its terms contemplates liability only for a provider that violates the Act "with a knowing or intentional state of mind." (*Id.*, subd. (a).) Moreover, the statute provides a safe harbor for a provider who, in "good faith," relies on "a court . . . order." (*Id.*, subd. (e)(1).)

otherwise lawful civil or criminal subpoena.  Hence, as the court held in *Negro*, *supra*, 230 Cal.App.4th 879, a provider may properly be subject to the burden of compliance

with a subpoena, even with respect to communications configured by the registered user to be *private*, when a user expressly consents to disclosure by his or her service provider.  Likewise, a provider may properly be subject to the burden of compliance with a subpoena when a user implicitly consents to disclosure by configuring a social media communication as *public*.

Of course, any third party or entity — including a social media provider — may defend against a criminal subpoena by establishing that, for example, the proponents can obtain the same information by other means, or that the burden on the third party is not justified under the circumstances.  (*City of Alhambra v. Superior Court* (1988) 205 Cal.App.3d 1118, 1134; cf. *Kling v. Superior Court* (2010) 50 Cal.4th 1068, 1074-1075, 1078.)  Indeed, the Act itself specifically contemplates that providers may raise such issues in the context of compelled disclosure to a governmental entity under section 2703(d) (a court "may quash or modify such order, if the information or records requested are unusually voluminous in nature or compliance with such order otherwise would cause an undue burden on such provider"), and the same principles would apply in the present setting.

As noted, providers advanced similar arguments regarding the burden of compliance with the subpoenas in the earlier trial court proceeding.  (*Ante*, part I.E.)  In response, the trial court ruled that absent additional factual information demonstrating impossibility or the extent of burdens, it could not engage in any such balancing of

production versus burden.  Providers' current claim of undue burden can properly be addressed by the trial court on remand.[47]

---

[47] The trial court on remand might also consider two additional and somewhat related legal issues that have been only generally alluded to in the briefing to date in this case, but which are highlighted in our January 17, 2018 order granting review in the related matter of *Facebook, Inc., v. Superior Court* (*Touchstone*) (2017) 15 Cal.App.5th 729 (S245203).  That order directs the parties to address, among other things (1) whether a trial court may compel a witness to consent to disclosure by a provider, subject to in camera review and any appropriate protective or limiting conditions; and (2) whether a trial court may compel the prosecution to issue a search warrant under the Act, on behalf of a defendant.

Finally, yet another matter, not discussed in the parties' briefs, may require consideration on remand.  As alluded to *ante*, part I.F., after the trial court confirmed its production ruling, counsel for defendant Sullivan asked that providers be ordered to preserve all data at issue in this case.  The court stated that it would not immediately issue an oral preservation order because it wanted the parties to first work out among themselves language addressing the providers' preservation obligations, and stated: "You will have to draft something and submit it, and see if you can reach an agreement. And if you get competing orders, we will have to have another hearing about that."  The record before us, however, contains no preservation order; no mention of such an order appears in the briefs; and the superior court docket for each case, as to which we have taken judicial notice, reflects no such order.  (See, e.g., *Williams v. Russ* (2008) 167 Cal.App.4th 1215, 1223 [addressing a party's "failure to preserve evidence for another's use in pending or future litigation" and corresponding sanctions].)

## IV. CONCLUSION AND DISPOSITION

We vacate the Court of Appeal's decision and direct that court to remand the matter to the trial court for proceedings consistent with this opinion.

**CANTIL-SAKAUYE, C. J.**

**WE CONCUR:**

**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**YEGAN, J.**[*]

---

[*] Associate Justice of the Court of Appeal, Second Appellate District, Division Six, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Facebook, Inc. v. Superior Court

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX  240 Cal.App.4th 203
**Rehearing Granted**

_____

**Opinion No.** S230051
**Date Filed:** May 24, 2018

_____

**Court:** Superior
**County:** San Francisco
**Judge:** Bruce E. Chan

_____

**Counsel:**

Perkins Coie, Christian Lee, James G. Snell, Eric D. Miller, John R. Tyler, Sunita Bali; Gibson, Dunn & Crutcher, Joshua S. Lipshutz and Michael J. Holecek for Petitioners.

Mayer Brown and Donald M. Falk for Google LLC as Amicus Curiae on behalf of Petitioners.

No appearance for Respondent.

Jose Pericles Umali for Real Party in Interest Derrick D. Hunter.

Susan B. Kaplan and Janelle E. Caywood for Real Party in Interest Lee Sullivan.

Jeff Adachi, Public Defender (San Francisco), Matt Gonzalez, Chief Attorney, and Dorothy Bischoff, Deputy Public Defender, as Amici Curiae on behalf of Respondent and Real Parties in Interest.

Stephen P. Lipson, Public Defender (Ventura) and Michael C. McMahon, Chief Deputy Public Defender, for California Public Defenders Association and Public Defender of Ventura County as Amici Curiae on behalf of Real Parties in Interest.

David M. Porter; Law Offices of Donald E. Landis, Jr., Donald E. Landis, Jr.; Law Offices of J.T. Philipsborn and John T. Philipsborn for California Attorneys for Criminal Justice and National Association of Criminal Defense Lawyers as Amici Curiae on behalf of Real Parties in Interest.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Joshua S. Lipshutz
Gibson, Dunn & Crutcher
555 Mission Street
San Francisco, CA  94105-0921
(415) 393-8200

Susan B. Kaplan
214 Duboce Street
San Francisco, CA  94103
(415) 271-5944