Filed 5/10/23  P. v. Williams CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ROBERT WILLIAMS,<br><br>    Defendant and Appellant. | D079156<br><br><br>(San Bernardino County Super. Ct. No. FSBSS702835) |

APPEAL from an order of the Superior Court of San Bernardino County, Lorenzo R. Balderrama, Judge.  Requests for judicial notice denied.  Order affirmed.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kathryn Kirschbaum and Collette C. Cavalier, Deputy Attorneys General, for Plaintiff and Respondent.

Robert Williams appeals from an order extending his commitment as a sexually violent predator (SVP). In an argument even his appellate lawyer calls "a technicality," he contends the prosecutor forgot to offer into evidence exhibits establishing that he committed prior "qualifying offenses"—that is, rape convictions and the circumstances surrounding those crimes. As we explain, this argument fails because the clerk's transcript shows the exhibits were received in evidence and nothing in the reporter's transcript indicates otherwise.

Williams also maintains that the order should be reversed because the court received testimonial hearsay evidence violating his right to confront witnesses. He acknowledges that the Sixth Amendment, which applies only to criminal proceedings, does not directly apply to his *civil* commitment matter. But he points to Penal Code section 1026.5, subdivision (b)(7), which provides that in civil commitment trials involving persons found not guilty by reason of insanity (NGI), the defendant "shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings." Williams contends that SVP's are similarly situated to NGI's in this respect and, therefore, under equal protection principles he is entitled to the same *statutory* rights.

We are guided by a policy of judicial restraint under which we do not reach constitutional questions unless " 'absolutely required to do so to dispose of the matter before us.' " (*Facebook, Inc. v. Superior Court* (2018) 4 Cal.5th 1245, 1275, fn. 31.) Accordingly, we reject Williams's equal protection argument because even if his constitutional argument is correct, any error was harmless. The psychologists who testified evaluated Williams themselves in face-to-face interviews. Without relying on hearsay reports,

they determined he suffers from a "severe mental disorder" that causes him to be sexually attracted to and aroused by raping women. Thus, even assuming (without deciding) that NGI's have confrontation-clause rights under Penal Code section 1026.5, subdivision (b)(7), and that the equal protection clause compels courts to afford SVP's the same rights, Williams was not prejudiced. Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In 1981 when he was 26-years-old, Williams entered a laundromat late at night with "his penis hanging out of his pants." He grabbed a woman, and after dragging her by the legs to a nearby park, raped her. Police officers had to "knock[ ] him off the victim."

Six months later, while released on bail pending trial for that crime, Williams pulled a woman into an unoccupied lavatory during a concert. He hit and choked the victim, threw her to the floor, and after forcing his penis into her mouth, raped her.

Following a term of imprisonment and while on parole for these crimes, Williams raped again. This time the victim was a neighbor. Williams was sentenced to state prison for 21 years. In 2001, he was civilly committed to Atascadero State Hospital as an SVP.

In 2007, a petition was filed to extend Williams's commitment. After many continuances at defense counsel's request (the appropriateness of which is not challenged on appeal), in late 2010 trial was continued so Williams could participate in treatment programs.

By stipulated order in April 2017, Williams agreed to submit "to face-to-face interviews by the evaluating doctors" to perform the updated evaluations. Further delays ensued while the parties litigated what they

3

called "the *Curlee* issue" in a bellwether case.[1]  Again in 2019, the parties stipulated that Williams would submit to new "face-to-face interviews" with psychologists.

In November 2020, Williams waived jury.  Kathleen Longwell, a psychologist, conducted "full" interviews with Williams in 2007, 2010, and November 2019.  Williams also told her he felt sensations (Longwell's term, " 'tactile delusions' ") that he was being anally raped.  These were associated with sexual thoughts and started when he was in prison.  By 2019, these occurred almost every day "in his genital area."  Williams described it as "an invisible hand" masturbating him.[2]

In Longwell's opinion, the "tactile sensations" are a manifestation of Williams's mental illness and "paraphilia."[3]  They are outside of his control, and he cannot manage them on his own.  Williams believes his *medication*, not mental disorder, causes the sensations.  Longwell found this significant. It shows he lacks "adequate insight into his mental illness . . . ."  And given that lack of insight, "he's not going to be able to self-manage in a less controlled environment."

---

[1]  *People v. Curlee* (2015) 237 Cal.App.4th 709, 721 (*Curlee*) held that under equal protection principles, SVPs are similarly situated to NGI's with respect to whether they can be compelled to testify at their commitment hearing.

[2]  Williams also told Longwell that he does not have erections, but she was skeptical, stating, "a lot of his answers were motivated by his desire to get out of the hospital."

[3]  Paraphilia is a sexual disorder in which the person has "intense sexual urges, fantasies, or behaviors.  In [Williams's] case, nonconsenting victims."

Longwell concluded it is "highly likely" that Williams "was experiencing some degree of psychosis" each time he raped. She was especially concerned that he rapidly reoffended each time:

> "[H]e's out on bail for the—for one sex offense, and while he's out on bail, he commits another sex offense. He goes to prison for those two—two offenses, and three months later, he commits another one." [¶] . . . [¶]
>
> "[W]here he reoffends so quickly after a legal sanction . . . indicates compulsivity, it indicates a mental disorder, a Paraphilic Disorder, an inability to—to volitionally control themselves.

At the time of trial, Williams was 65-years-old and suffered from arthritis in his lower back and knees.[4] Longwell acknowledged that violence and aggression tend to decrease as people get older. But in this case, she explained, "We're not going to see the kind of decrease with his age because he's still very agitated when his—when his psychosis isn't consistently medicated." She noted that Williams's age was considered in scoring his Static-99R test, but even then, he was determined to be an "above average risk."[5] Longwell concluded, "even though his risk is lower than it was when he was a younger man, I can't say that it's—that age has had an immense impact on him."

Longwell believes Williams would have a "decent prognosis" if he consistently took his medications and underwent treatment, but neither is

---

[4] But he also told Longwell that he goes out for a walk "on the track a couple of times a day."

[5] The Static-99R scale "measures the statistical risk of reoffense based on characteristics of the subject's personal history and past offenses as they compare with those of known criminal sexual recidivists." (*People v. Williams* (2003) 31 Cal.4th 757, 762, fn. 3.)

likely to occur because he does not think he has a mental illness. This creates an "ongoing problem" in convincing him to take his medications. As evidence of that, she noted that staff has been required to involuntarily medicate him numerous times.

Another psychologist, Douglas Korpi, reached similar conclusions after interviewing Williams in 2017 and 2020. He explained:

> "What precisely makes this man a risk is that he's psychotic and impulsive because psychosis makes you impulsive. The fact that he's still focused on his genitals, you put impulsivity with genitals, you put those two things together, and it makes you concerned that when he gets out, he might do something impulsive once again related to sexual behavior, and what he's done before is rape women.

> "So that's why I found him to be a sexually violent predator because I'm afraid that the combination of psychosis and genital stimulation will—will render him a danger when he's released to the community."

For Korpi, the "single most important issue in the case" is that Williams "tells me he has no idea" why he is supposed to take medications. He does not understand "in any real sense" that he suffers from a mental disorder. He voluntarily takes medications only because he knows if he refuses, he'll be strapped down.[6]

The court determined that Williams "meets the criteria of being a sexually violent predator." It found "beyond a reasonable doubt" that Williams "has been convicted of a sexually violent criminal offense against one or more victims." The court noted that he has "two diagnosable mental

---

[6] Korpi testified that Williams had "been *Calhouned* at least three or four times"—an apparent reference to *In re Calhoun* (2004) 121 Cal.App.4th 1315, 1355 (holding that under certain circumstances SVP's can be involuntarily medicated).

disorders that predispose him to the commission of criminal sexual acts"—
Paraphilic Disorder, sexually attracted to and aroused by forced,
nonconsensual sex, and "Schizoaffective Disorder, Bipolar-Type." Without
treatment in custody, Williams was determined to be "likely to engage in
sexually violent predatory criminal behavior." Addressing the effect of
Williams's age, the court explained:

> "If [he] was just a rapist at age 65, with the medical and
> health issues such as arthritis, diabetes, and at his age
> claims that he cannot get an erection, it would not
> appear . . . that he qualifies as an SVP . . . . However, a
> look at his history shows that there is more involved here.

> "His Schizoaffective Disorder is working together with the
> paraphilic nonconsent disorder, . . . rendering him likely to
> engage in sexually violent predatory criminal behavior as a
> result of diagnosed mental disorders such that he remains
> a serious and well-founded risk to reoffend." [¶] . . . [¶]

> "While [Williams] has several medical issues and is at age
> 65 and claims he does not masturbate anymore by his own
> admissions, he is still subject to sexual tactile
> hallucinations even while on medication. Both Dr.'s Korpi
> and Longwell have opined that in spite of his age and
> health issues that [he] is capable of acting on the sexual
> arousal from his sexual tactile hallucinations by sexually
> assaulting someone in the community."

## DISCUSSION

A.  *Exhibits Establishing Williams's Qualifying Offenses Were Received in
    Evidence*

The Sexually Violent Predators Act (Act) (Welf. & Inst. Code,[7] § 6600 et
seq.) provides for the involuntary commitment of certain sexually violent

---

[7]     Undesignated statutory references are to the Welfare and Institutions
Code.

predators after completion of their prison terms. (*People v. Roberge* (2003) 29 Cal.4th 979, 984.) It is intended to provide " 'treatment for mental disorders from which they currently suffer and reduce[ ] the threat of harm otherwise posed to the public.' " (*Walker v. Superior Court* (2021) 12 Cal.5th 177, 190 (*Walker*).)

To commit under the Act, the state must show: (1) the person has previously been convicted of at least one qualifying " 'sexually violent offense' listed in section 6600, subdivision (b)"; (2) they have a " 'diagnosed mental disorder' " making them a danger to the health and safety of others; (3) the mental disorder makes it likely the person will engage in future acts of sexually violent criminal behavior if released; and (4) "those acts will be predatory in nature." (*Walker, supra*, 12 Cal.5th at p. 190.)

Williams's prior convictions for rape and forced oral copulation are qualifying sexually violent offenses. (§ 6600, subds. (a)(2) & (b); Pen. Code §§ 261, subd (a)(2), *id.,* 287, subd. (c)(2)(A).) To facilitate proving that element, the Act contains a hearsay exception allowing the government to use documentary evidence to establish the existence and details of those offenses. (§ 6600, subd. (a)(3).) In this case, on the second day of trial, the people filed an "Exhibit List" identifying (1) court records from Williams's prior criminal cases; (2) a San Bernardino County Sheriff's Department report; (3) a probation report; (4) a "969b packet,"[8] and (5) records from the Department of Corrections and Rehabilitation and State Department of State Hospitals (DSH)—which were identified as exhibits 1 through 6.

---

[8]    Certified prison records submitted under Penal Code section 969b are commonly called "969b packets." (See, e.g., *People v. Gibson* (2015) 239 Cal.App.4th 1151, 1153.)

8

The clerk's minutes indicate that proceedings that day (November 18, 2020) started at 8:30 a.m. But the first witness, Longwell, did not testify until two hours later. According to the minutes, at an unspecified time between 8:30 and 10:30 a.m., exhibits 1 through 6 were received in evidence. Consistent with that, exhibits 1 through 5 have a handwritten notation indicating each was identified and received in evidence on "11-18-20."[9] The one attached to exhibit 5, copied below, is representative:



Because the minute order is the crux of Williams's substantial evidence argument, it too is copied below:

_____

[9]    Exhibit 6 is a recordable digital video disk labeled, "CDCR/DSH Records."

**MINUTE ORDER**

Case Number: FSBSS702835                                    Date: 11/18/2020

Case Title:   PEO OF THE STATE OF CALIF V ROBERT WILLIAMS

Department S10 - SBJC          Date: 11/18/2020      Time: 8:30 AM      Hearing Re:

Judicial Officer: Lorenzo Rafael Balderrama
Judicial Assistant: Susan Verduzco
Court Reporter: Susan Keil
Bailiff: J Swavely

Appearances
Deputy District Attorney Melinda Spencer present
Deputy Public Defender Charlene McKinley-Powell present
Respondent appears telephonically

Proceedings
Petitioner's exhibit 1-6 marked for identification.

Petitioner's exhibit 1-6 entered into evidence.

10:30 AM
People's witness Dr. Kathleen Longwell present remotely via video sworn in and testifies.

The reporter's transcript for November 18 begins with Longwell's testimony, which according to the minutes did not start until 10:30 a.m. Thus, the clerk's minutes show that exhibits 1 through 6 were received in evidence, but the reporter's transcript does not begin until sometime later. The reporter's transcript does not contain the ordinary colloquy where the prosecutor would offer the exhibits into evidence, the defense would object (or not), and the court would state they were received.

On appeal, Williams characterizes this state of the record as a conflict and discrepancy between the clerk's and reporter's transcripts. He speculates that "the court clerk could have simply assumed that [the exhibits] had been introduced into evidence because that was undoubtedly" the deputy district attorney's intent. Williams insists that the conflict must be resolved in favor of the reporter's transcript—which means the exhibits were not received in evidence. As a result, he claims there was no substantial evidence to support the finding that he committed a qualifying offense.

10

The argument is inventive, but fails because there is, in reality, no conflict between the clerk's and reporter's transcripts. The clerk's minutes state that the exhibits were received in evidence. The reporter's transcript does not state they were refused admission. It is merely *silent* about it. This situation is similar to that in *People v. Malabag* (1997) 51 Cal.App.4th 1419 (*Malabag*). There, the clerk's minutes, but not the reporter's transcript, stated that the defendant waived formal arraignment and his right to a revocation hearing. The silence of the transcript, he contended on appeal, established that no waivers occurred. (*Id*. at pp. 1421–1422.) The appellate court rejected the argument. Although the reporter's transcript was incomplete, its silence did not contradict the minutes. (*Id*. at p. 1422.)

Similarly here, the reporter's transcript is silent (i.e. incomplete), but that does not mean it contradicts the minutes. We do not know all that happened in this case between 8:30 and 10:30 a.m. on November 18, but we are confident that the exhibits establishing Williams's qualifying offenses were offered and received in evidence. The minutes say so, the exhibits contain handwritten notations confirming it—and nothing in the clerk's or reporter's transcripts states otherwise.

Attempting to distinguish *Malabag*, Williams highlights that the reporter's transcript there was "less than a page in length" and obviously began "in the middle of the proceedings." Thus, the court of appeal in *Malabag* could reasonably infer that the transcript was incomplete. According to Williams, in contrast here nothing suggests that the reporter's transcript for November 18 is anything less than a record of the day's *entire* proceedings. This is not a reasonable reading of the record. Court began two hours before Longwell testified. Necessarily, the reporter's transcript, which

11

begins with her testimony, is less than a complete account of that court day. (*Malabag*, *supra*, 51 Cal.App.4th at pp. 1422–1423.)

Williams speculates that "the only way" the minutes could be correct and the reporter's transcript silent is "if someone deliberately sought to create a defective transcript of the oral proceedings . . . ." He surmises that the reporter was "either excluded" when the exhibits were received in evidence, or "negligently failed to transcribe the hearing." But as appellate counsel later concedes, "there is no reason why anyone would do this." We agree; it could not have happened that way.

The more plausible explanation is that with a witness not due for another two hours, the reporter was elsewhere when the exhibits were marked and received in evidence. The transcript is silent about the exhibits probably because there was nothing for anyone to debate about their admissibility. They were clearly admissible under section 6600, subdivision(a), and neither at trial nor on appeal has Williams asserted otherwise.[10]

Williams concedes that the exhibits, if admitted into evidence, demonstrate he committed qualifying offenses. Because they were properly before the court, his substantial evidence claim fails. Moreover, Longwell

---

[10]  "The existence of any prior convictions may be shown with documentary evidence. The details underlying the commission of an offense that led to a prior conviction, including a predatory relationship with the victim, may be shown by documentary evidence, including, but not limited to, preliminary hearing transcripts, trial transcripts, probation and sentencing reports, and evaluations by the State Department of State Hospitals." (§ 6600, subd. (a)(3).)

12

and Korpi could consider details from those records in forming their opinions. (*People v. Roa* (2017) 11 Cal.App.5th 428, 446.)[11]

B.    *Williams Was Not Prejudiced by Any Confrontation Clause Error, and In Any Event, Forfeited the Issue*

Commitment proceedings for both SVP's and NGI's are civil, not criminal, matters because they are directed at confinement for treatment rather than punishment. (*Moore v. Superior Court* (2010) 50 Cal.4th 802, 818; *Hudec v. Superior Court* (2015) 60 Cal.4th 815, 819 (*Hudec*).) As such, the right to confront witnesses under the Sixth Amendment, which begins with the words, "In all criminal prosecutions . . . ," does not directly apply. (See *San Diego Police Department v. Geoffrey S.* (2022) 86 Cal.App.5th 550, 574 [confrontation clause only applies to criminal proceedings].) The parties do not dispute that.

But a *statute*, Penal Code section 1026.5, subdivision (b)(7), may indirectly afford NGI's what the Sixth Amendment does not. It provides that in an NGI's commitment hearing, "[t]he person shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings." (Pen. Code, § 1026.5, subd. (b)(7).) This statute has been construed, for example, to incorporate a right not to be compelled to testify against oneself. (*Hudec*, *supra*, 60 Cal.4th at p. 826.)

After *Hudec*, the court in *Curlee* took this a step further. It held that under equal protection principles, SVP's are similarly situated to NGI's for purposes of being compelled to testify in their commitment proceedings. (*Curlee*, *supra*, 237 Cal.App.4th 709.) The court reasoned that "[b]oth groups

_____

11    Because the exhibits were admitted into evidence, it is unnecessary to address Williams's alternative argument that expert testimony relating facts about those rapes cannot be considered.

13

have committed a criminal act and have been found to suffer from a mental condition that might present a danger to others. [Citation.] At the end of the SVP's prison term, and at the end of the term for which an NGI could have been imprisoned, each is committed to the state hospital for treatment if, at the end of that period, the district attorney proves in a jury trial beyond a reasonable doubt that the person presents a danger to others as a result of a mental disease, defect, or disorder. [Citations.] The purpose of the commitment is the same: To protect the public from those who have committed criminal acts and have mental disorders and to provide mental health treatment for the disorders." (*Curlee*, at p. 720.)[12]

Turning now to the Sixth Amendment, it provides that defendants have a right to confront and cross-examine witnesses who "bear testimony" against them. (*Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).) As *Crawford* explained, "admission of testimonial statements of a witness who did not appear at trial" is not permitted unless the witness "was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Id*. at pp. 53–54.) Although sometimes the distinction between testimonial and nontestimonial hearsay is difficult to make, generally "a declarant's hearsay statement is testimonial if made 'with a primary purpose of creating an out-of-court substitute for trial testimony.' " (*People v. Tran* (2022) 13 Cal.5th 1169, 1196–1197.)

Here, relying on the reasoning in *Hudec* and *Curlee*, Williams contends that *Crawford* should apply in SVP commitment extension trials. His argument consists of three component parts: (1) Under Penal Code section

---

12 Of course, that alone does not establish an equal protection *violation*. Thus, in *People v. Field* (2016) 1 Cal.App.5th 174, this court followed *Curlee*, but remanded to allow the trial court to determine if there was a compelling interest that justified the disparate treatment. (*Field*, at p. 197.)

1026.5, subdivision (b)(7), the Legislature has given *Crawford* confrontation-clause rights to NGI's; (2) *Curlee* principles indicate that SVP's are similarly situated with respect to this right; therefore, (3) under the equal protection clause, SVP's must also be afforded *Crawford* rights.

Defense counsel raised this issue before trial, moving in limine to exclude "case-specific facts unless it can be demonstrated there is both an applicable hearsay exception and that the facts are not testimonial," or "the declarant of the case-specific testimonial information is unavailable and [he] has had a prior opportunity to cross-examine the declarant."

In part, the motion was based on *People v. Sanchez* (2016) 63 Cal.4th 665, 684 (*Sanchez*), which prohibits an expert from testifying to case-specific hearsay absent an applicable hearsay exception. To that extent, the trial court granted it. But as to other testimonial hearsay evidence, the trial court ruled that *Crawford* did not apply, commenting, *"and that would be my tentative, and we'll see what the testimony reveals."* (Italics added.)

On appeal, Williams maintains that the trial court erroneously denied his motion, and as a result "a large amount of evidence" was considered that "should have been excluded under *Crawford*." Before addressing the point, we deal with two preliminary issues raised by the Attorney General, who contends we should dispose of this issue without reaching the merits.

The first is a line of caselaw, including two California Supreme Court cases (*Sanchez, supra,* 63 Cal.4th at p. 680, fn. 6, and *People v. Otto* (2001) 26 Cal.4th 200, 214) holding that "the right to confrontation does not apply to civil commitment proceedings." If "right to confrontation" is understood to mean a direct application of the Sixth Amendment—*as was the context it was used in the cited cases*— that statement is undoubtedly true.

But the issue here is decidedly different and as a result those cases are not controlling. Williams is not claiming that the Sixth Amendment applies to his SVP commitment extension trial. His argument is that by *statute*, the Legislature has conferred those rights to NGI's in *their* commitment hearings, and under equal protection principles the same *statutory* right must also be provided to SVP's. The cases the Attorney General relies on do not concern or address that question.13

The second reason the Attorney General contends we need not decide the merits is forfeiture. After the court denied his motion in limine, defense counsel never raised a *Crawford* objection when the challenged evidence was offered. The Attorney General contends, and we agree, this results in forfeiture on appeal. This conclusion is inescapable because the trial judge said his pretrial ruling was merely "tentative" and he left open the possibility of changing it based on "what the testimony reveals." Under these circumstances, to preserve the issue for appeal, an objection must be renewed when the evidence is offered during trial. (*People v. Holloway* (2004) 33 Cal.4th 96, 133.)

If a timely objection had been made, the prosecutor (as proponent of the evidence) would have had the burden to show it was not testimonial hearsay. (See *People v. Ochoa* (2017) 7 Cal.App.5th 575, 584.) But because counsel made no contemporaneous objection, no foundation was laid. We simply do not know whether the evidence Williams challenges for the first time on appeal was testimonial or not. For example, he contends Longwell's testimony from certain correctional and hospital records about his

---

13      *People v. Bona* (2017) 15 Cal.App.4th 511, 520; *People v. Roa* (2017) 11 Cal.App.5th 428, 455, and *People v. Angulo* (2005) 129 Cal.App.4th 1349, 1367—cited by the Attorney General for this point—also do not address the equal protection issue here.

(1) masturbating while looking at correctional officers; (2) misconduct in prison; and (3) other behavior and symptoms at the state hospital was testimonial. But medical reports created *for treatment purposes* are not testimonial. (*People v. Rodriguez* (2014) 58 Cal.4th 587, 634–635 [medical records from emergency room visit not testimonial because created for treatment purposes].) Yet, it is conceivable that when treating an SVP, a medical record might be made with the primary purpose of being evidence at a commitment extension hearing. Without an objection when the evidence was offered, the record is undeveloped, and it is impossible to determine for the first time on appeal whether the challenged evidence was testimonial.

On appeal, Williams has the burden to affirmatively establish error; he cannot demonstrate a confrontation clause violation by essentially asking us to presume constitutional error based on an undeveloped record. (*See People v. Giordano* (2007) 42 Cal.4th 644, 666 [" ' "error must be affirmatively shown" ' "].)

Anticipating that the issue may have been forfeited, Williams further contends that defense counsel's failure to timely object constitutes ineffective assistance of counsel.[14] To establish the ineffective assistance of counsel, a defendant must establish that his attorney's representation fell below an objective standard of reasonableness under prevailing professional norms, and that he suffered prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 694.) Prejudice is established by showing that there is a reasonable probability of a more favorable result absent the attorney's shortcomings.

---

[14]    The parties submitted supplemental briefs on the issue of ineffective assistance of counsel. We deferred filing the briefs to the merits panel. The appellant's supplemental brief was received on November 29, 2022, and the respondent's on December 15, 2022. Each is deemed filed nunc pro tunc to the date it was received.

(*Ibid.*)  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.  (*Ibid.*)  A reviewing court may resolve an ineffective assistance of counsel claim by deciding only the question of prejudice.  "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."  (*Id.* at p. 697.)

In this case, even assuming that *Crawford* objections were timely made and erroneously overruled, we would find no basis for reversal. *Conservatorship of Eric B.* (2022) 12 Cal.5th 1085 involved a similar issue. There, the California Supreme Court addressed an equal protection challenge not unlike the one here.  The appellant claimed that an NGI's right under Penal Code section, subdivision (b)(7) to not be compelled to testify should also apply to those facing conservatorship under the Linderman-Petris-Short Act.  (*Eric B.*, at p. 1092; § 5350.)  The Supreme Court found it unnecessary to decide that issue because any error was not prejudicial.  (*Eric B.,* at p. 1107.)  This was because, apart from the challenged evidence, two other witnesses " 'painted a vivid picture of someone who was unable to care for himself left to his own devices due to his mental illness' "—a conclusion the appellant in that case did not challenge.  (*Ibid.*)

Similarly here, entirely apart from the evidence Williams contends is inadmissible under *Crawford*, the testifying psychologists examined him themselves and did not rely on any third-party records for their conclusions that Williams has mental disorders that make him an SVP.  Longwell personally interviewed him three times, most recently in November 2019. She relied on what *he* told her about his psychiatric and social history. Indeed, in his direct examination, the prosecutor carefully prefaced some questions with, *"I'm only asking what he told you."*

18

In the 2010 interview, Williams described the bathroom rape and also gave details about raping the neighbor. He also told Longwell, "That he had been looking at—pornography and masturbating while looking at female correctional officers." In the 2017 interview with Longwell, Williams said he was "plagued" by sensations in his genital area. He also admitted *to her* that he exposed himself at the state hospital while masturbating to female staff. In 2019, Williams told Longwell about his "tactile delusions"—the feeling that "something inside of his rectum was both at times sexually stimulating and caused him to get erections and sometimes to masturbate, and lots of times it was a very uncomfortable feeling." Longwell also scored tests designed to predict Williams's future dangerousness. She explained that the scoring was based not merely on the records, but also "what he told me." One test indicated he has "a high risk of sexual reoffend[ing]."

The foundation for Korpi's testimony was similar. He personally interviewed Williams. In 2017, Williams described having "very vigorous" tactile sensations in his genitals. Korpi also testified that "he tells me he has no idea why he's on these darn meds, and these darn foreign doctors keep prescribing these things, God knows why." Korpi *asked Williams* what would happen if he stopped taking his medications. His answer—that he does not need medication and is "struggling" with taking his medications—was in Korpi's opinion "the" dispositive issue in the case.

In sum, there was compelling, independently admissible evidence establishing that Williams remains an SVP. We need not resolve, therefore, whether the trial court's ruling violated his equal protection rights, or whether counsel rendered ineffective assistance by not making

19

contemporaneous objections. Any such error or deficiency was not prejudicial under any standard.[15]

DISPOSITION

The order is affirmed.


DATO, J.

WE CONCUR:


McCONNELL, P. J.


BUCHANAN, J.

---

[15] Williams's requests for judicial notice of the reporter's transcript from (1) a March 7, 2008 hearing in a different case; and (2) an August 2, 2013 hearing in another case are denied. The August 2013 transcript solely concerns a request for a continuance in an unrelated case and is, therefore, not relevant to any issue on appeal. As to the March 7, 2008 request, the court reporter has filed a declaration stating that after "thoroughly check[ing] her stenographic notes" for that day, the requested matter does not exist.

20